Filed 4/20/16  Certified for Partial Pub. 5/16/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DANIEL RAYMOND MCENTIRE et al.,<br><br>  Defendants and Appellants. | F067666<br><br>(Super. Ct. No. F13901539)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Raymond McEntire.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Manuel Martinez Rodriguez.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Peter H. Smith and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendants Daniel Raymond McEntire and Manuel Martinez Rodriguez were jointly tried and convicted by a jury of the following offenses:  first degree residential burglary (Pen. Code, §§ 459, 460, subd. (a), count 1),[1] possession of a firearm by a felon (§ 29800, subd. (a)(1), counts 2 and 3), unlawful possession of ammunition (§ 30305, subd. (a), counts 4 and 5), carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(3), counts 6 and 7), and active participation in a criminal street gang (§ 186.22, subd. (a), count 8).  In addition, Rodriguez was convicted of resisting a peace officer, a misdemeanor (§ 148, subd. (a)(1), count 9).

The jury found true a gang enhancement on counts 1 through 7 as to both defendants (§ 186.22, subd. (b)(1)).  Rodriguez also admitted a prior prison term (§ 667.5, subd. (b)).  Rodriguez was sentenced to an aggregate term of 16 years 8 months in state prison and McEntire was sentenced to 15 years 8 months.

Defendants jointly make the following claims on appeal:  (1) insufficient evidence supports the substantive gang charge (count 8); (2) insufficient evidence supports the gang enhancements on counts 1 through 7; (3) insufficient evidence supports the jury's finding a nonparticipant was present during the commission of the burglary; (4) the trial court erred in instructing the jury regarding the presence of a nonparticipant during the burglary; (5) the trial court erred in failing to define "present during the commission of a burglary" sua sponte; (6) the trial court erred in failing to define "in association with a criminal street gang" sua sponte; (7) the trial court erred in denying defendants' motion to bifurcate the gang enhancement allegations; and, (8) defendants' sentences for unlawful possession of ammunition (counts 4 and 5) must be stayed pursuant to section 654.  We agree with defendants' claim counts 4 and 5 must be stayed.  In all other respects, the judgment is affirmed.

---

[1]All undesignated statutory references are to the Penal Code unless otherwise indicated.

# FACTS

On August 28, 2012, at approximately 8:14 a.m., Veronica Beltran was lying on a sofa in her living room when her dog started barking. Beltran looked outside her window and saw a man, McEntire, in her backyard. She assumed McEntire was a gardener or a PG&E meter reader, closed her curtains, and laid back down.

Beltran testified McEntire approached the home and tried to pull open the living room sliding glass door. He was wearing a hooded sweatshirt, jeans, white shoes with a black stripe, yellow gloves, a backpack, and a mask. Beltran dialed 911 from a wireless phone. As she picked up her dog to run outside, she made eye contact with McEntire for a few seconds.

Beltran ran outside her front door and crossed the street in front of her home. Based on the sound of glass being shattered, she told the 911 operator the man had entered her home.

As she ran back across the street to find help, Beltran saw a white van parked by the side of her home. A man sitting in the driver's seat got out of the vehicle and asked her what was wrong. Beltran later realized the man, Rodriguez, was her husband's cousin, whom she knew as Manuel or "Peanut." Beltran told Rodriguez to leave and informed him she had called the police. Rodriguez approached the fence of Beltran's backyard and yelled, "'Hey, Dog. Come on. Let's go. She is already out here. We got to go.'" Rodriguez then walked toward the front of the home and Beltran lost sight of him.

After a few moments, McEntire walked over to the van from the front of the home, got into the driver's seat, and backed the van into Beltran's driveway. He got out of the vehicle and disappeared from Beltran's sight. After an unspecified period of time, McEntire got back inside the van, and picked up Rodriguez, who had begun walking down the street. They drove away.

Frank Nelson of the Fresno Police Department responded to the incident. He conducted a walk-through of the home with Beltran. They observed the exterior screen door on Beltran's dual pane sliding glass door had been pulled off its track, and the door's exterior glass pane had been shattered and separated from the interior glass pane. In the master bedroom, the doors to an armoire were opened and the bottom drawers were pulled out. Jewelry boxes had also been opened. A door from the interior of the house leading to the garage had been opened. Beltran noted an iPhone was missing from her home.

Shortly thereafter, Fresno police officers saw a white van matching the description of the suspects' vehicle traveling on a frontage road parallel to Highway 99. Officer Tharen Higgenbotham followed the van and activated his emergency lights and siren, but the vehicle did not stop. When the vehicle reached a dead end, Rodriguez exited the van and ran. He stopped after he was threatened with a K-9 warning.

Pursuant to an in-field identification, Beltran identified McEntire as the man who broke into her home and Rodriguez as the man she encountered sitting in the van parked on the street. Beltran recognized Rodriguez, in part, because of his physique and because he was wearing a red, black, and white jersey with a number on it. She recognized McEntire, who was wearing a mask during the burglary, based on his size, as well as on his sweatshirt and shoes.

Police searched the van and found a .357 Magnum revolver with six cartridges in the cylinder; a nine-millimeter semiautomatic handgun loaded with 10 rounds; a gray Fresno State Bulldog hooded sweatshirt; a red, black, and white Chicago Bulls jersey with the lettering "Bulls 1" on the front and "Rose 1" on the back. After a second search of the vehicle, police found a pair of yellow dishwashing gloves. McEntire was listed as the vehicle's registered owner.

During police questioning, Rodriguez told detectives he was a member of the East Side Bulldog gang and had been since 11th grade. He initially denied being present at

4.

the scene of the burglary, but later acknowledged he was there and had encountered Beltran outside of her home. He claimed he left when Beltran told him she called the police.

**Gang Evidence**

*Prosecution*

Fresno County Sheriff's Detective Eric Cervantes, an expert on Bulldog street gangs, testified for the prosecution. According to Cervantes, the Bulldogs have six major sects in Fresno, and the Fifth Street Bulldogs are a subset of the Bulldogs.

He explained Bulldog gang members originally wore red, but have more recently begun wearing black and white, or gray. They often wear clothing with the Fresno State Bulldog logo, as well as Chicago Bulls jerseys. Members of the Fifth Street Bulldog gang wear the same colors and symbols as the main Bulldog gang, but Fifth Street Bulldogs frequently use the number "5." Cervantes testified members of the Bulldogs call each other "dog," and the phrase "What's up, dog?" is a common gang greeting.

The primary activities of the Fifth Street Bulldog gang include grand theft, assault with a deadly weapon, and possession of a firearm by a felon. Based on convictions of several self-identified members of the gang of the foregoing offenses, Cervantes opined the Fifth Street Bulldog gang was involved in an ongoing pattern of criminal activity.

In determining whether an individual is an active gang member, Cervantes explained he looks at multiple indicators, including jail classifications; tattoos; whether an individual has been arrested with other gang members; documented associations with other known gang members; showing ("throwing") of gang signs; whether the individual wears or owns gang clothing; information from reliable sources, such as family members or significant others; the possession of items containing gang graffiti; and lists gang members possess that include the names of other gang members.

Cervantes opined both Rodriguez and McEntire were active members of the Fifth Street Bulldog gang based on multiple indicators. Rodriguez had several prominent gang

5.

tattoos, including a large number "5" on his neck, "Fresno" on his back, "5th" on his forearm, "FS" on another part of his forearm, a bulldog face on the bottom of his wrist, and a dog paw on the right side of his face next to his eye. Rodriguez was classified by Fresno County jail officials as a member of the Bulldogs nine times between 2003 and 2012, and his girlfriend of seven years told police he was a member of the Bulldogs. Cervantes also formed his opinion based on a photograph of Rodriguez holding a sawed-off shotgun and flashing a gang sign. He found it significant Rodriguez was wearing a Chicago Bulls jersey during the commission of the burglary because Bulldogs wear Chicago Bulls jerseys.

McEntire had a large dog collar tattooed around his neck with the words "Dred Dog" below the collar. In addition, the Bulldog emblem was tattooed on his back above the letters "ESF" (East Side Fresno), and the word "Fresno" was tattooed across his chest. McEntire had been classified by jail officials as a Fifth Street Bulldog on five occasions between January 2007 and October 2012. An officer from a multiagency gang task force also identified McEntire as a member of the Fifth Street Bulldog gang. Cervantes stated he observed a photograph of McEntire kneeling in front of 15 known Bulldog gang members. In the photograph, McEntire was wearing a Chicago Bulls jersey and throwing a gang sign.

Based on a hypothetical premised on the facts of the instant case, Cervantes concluded two gang members whose conduct mirrored Rodriguez's and McEntire's would be "associating together to commit the crime of residential burglary." He stated both gang members would be actively assisting each other in a burglary because one gang member was acting as a lookout while the other broke into the home. Cervantes found it particularly significant one of the perpetrators called the other "dog" during the burglary. He explained: "That statement is huge, because Bulldog gang members refer to each other as dog …. In this case, he says, 'Hey, Dog. She's out here.'" He also based his

conclusion on gang-related clothing discovered in the vehicle used in the commission of the burglary.

In response to another hypothetical, Cervantes testified the guns were also possessed in association with a criminal street gang, based on the individuals inside the vehicle and the gang clothing found between the driver and passenger seat chairs, underneath the loaded firearms.

*Defense*

Michael Fitzgerald, an expert in Fresno criminal street gangs, testified for the defense. In his opinion, Rodriguez and McEntire were not active gang members.

Fitzgerald based his opinion on a lack of documented contacts between defendants and other active gang members. If defendants were active, he would expect to see more contacts with law enforcement. With respect to jail classifications, he explained former gang members often want to avoid being housed with members of other gangs for safety reasons, so many gang members are active when they are in jail.

Fitzgerald stated "dog" is a common nickname among non-gang members, including law enforcement officers. According to Fitzgerald, although tattoos are a good indicator of gang membership, this is not always the case because tattoo removal treatments are costly, and free tattoo removal programs have lengthy waiting lists. Assuming the undated photographs of defendants were a few years old, Fitzgerald stated it would not substantiate the fact they were currently active gang members.

**DISCUSSION**

1.  **Substantive Gang Charge (§ 186.22, subd. (a))**

Defendants contend there is insufficient evidence to support their conviction on count 8 for actively participating in a criminal street gang (§ 186.22, subd. (a)). We disagree.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such

7.

that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1067.) In reviewing a record for substantial evidence, we may not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). Our sole function is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Marshall* (1997) 15 Cal.4th 1, 34.) We reject evidence accepted by the trier of fact only when it is inherently improbable and impossible of belief. (*People v. Maxwell* (1979) 94 Cal.App.3d 562, 577.)

Section 186.22, subdivision (a) makes it a crime to "actively participate in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." The substantive gang offense is composed of three elements: (1) active participation in a criminal street gang; (2) knowledge the gang's members have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance of any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523.) "All three elements can be satisfied without proof the felonious criminal conduct promoted, furthered, or assisted was gang related." (*People v. Albillar* (2010) 51 Cal.4th 47, 55–56.)

First, we conclude substantial evidence supports the conclusion McEntire and Rodriguez were active members of the Fifth Street Bulldog criminal street gang at the time the instant crimes were committed. Detective Eric Cervantes testified as an expert on Bulldog street gangs. In his opinion, defendants were active gang members based on a number of indicators.

8.

With respect to Rodriguez, his long-term girlfriend previously told police he was a Bulldog. Rodriguez himself admitted as much after he was arrested following the burglary, stating he was a member of the East Side Bulldog gang and had been since the 11th grade. He had several prominent gang-related tattoos, including a large "5" on the left side of his neck, "Fresno" across his back, "5th" and "FS" on his forearm, a bulldog face on his wrist, and a paw print on the right side of his face next to his eye. Rodriguez was also classified by Fresno County jail officials as a Fifth Street Bulldog nine times between 2003 and 2012. A photograph admitted into evidence depicted him holding a sawed-off shotgun and flashing a gang sign.

McEntire also had multiple gang-related tattoos, including a large dog collar around his neck with his moniker, "Dred Dog," below the collar, a bulldog emblem on his back, and the letters "ESF" and "Fresno" across his chest. He was classified by jail officials as a Fifth Street Bulldog on five occasions between January 2007 and October 2012, and had been identified as a member of the Fifth Street Bulldog gang by a Fresno County Multi-Agency Gang Enforcement Consortium detective. A photograph of McEntire showed him with 15 known Bulldog gang members while wearing a Chicago Bulls jersey and flashing a gang sign.

According to Cervantes, the circumstances of the instant crimes also support the conclusion defendants are active gang members. Rodriguez called McEntire "dog" during the burglary, a common phrase used by Bulldog gang members. Fresno State Bulldog apparel was found inside McEntire's van after a search by police, and Rodriguez was wearing a Chicago Bulls jersey when Beltran confronted him outside her home. Cervantes testified these items of clothing are commonly worn by Bulldog gang members. Two loaded guns were also found inside the van. According to Cervantes, the illegal possession of firearms is one of the primary gang activities of the Fifth Street Bulldog gang.

9.

Defendants assert the gang evidence could also support the inference they were former, but not active gang members, based on Fitzgerald's expert witness testimony. While this is also a permissible inference, the jury heard conflicting evidence as to defendants' gang membership status and concluded defendants had more than nominal or passive involvement in the Fifth Street Bulldog gang. (*People v. Castenada* (2000) 23 Cal.4th 743, 747.) We will not reappraise the credibility of the expert witnesses, nor will we reevaluate factual conflicts resolved by the jury. (*In re Frederick G.*, *supra*, 96 Cal.App.3d at p. 367.)

McEntire argues throwing gang signs and using the word "dog" does not amount to much evidence. We agree these factors alone would be insufficient to support a finding of active gang membership, however, Cervantes's opinion was based on the *totality* of the evidence. The gang signs, use of the word "dog," gang-related clothing, photographs with fellow gang members, gang-related tattoos, and jail classifications in totality support the jury's finding defendants were active gang members.

Defendants also contend the evidence here stands in stark contrast to cases where the court found sufficient evidence of active gang participation. (See *People v. Castenada*, *supra*, 23 Cal.4th 743; *In re Jose P.* (2003) 106 Cal.App.4th 458.) When issues related to sufficiency of the evidence are decided, comparisons to other cases are of limited value because each case necessarily depends on its own facts. (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) In any event, the totality of the evidence against defendants amply supports the jury's finding they were active gang members.

Second, although neither defendant challenges the jury's finding on the second element, we find substantial evidence defendants had knowledge the gang's members engaged in a pattern of criminal activity under section 186.22, subdivision (a). Circumstantial evidence established defendants had the requisite knowledge based on Cervantes's testimony Bulldogs boast among one another about their crimes.

Finally, the "willful assistance" element is also met because McEntire and Rodriguez, both gang members, actively assisted one another in the commission of the crimes. Rodriguez stayed in the van and acted as a lookout while McEntire broke into Beltran's home. Rodriguez alerted McEntire when Beltran discovered them. When Rodriguez exited the van and disappeared from Beltran's sight, McEntire got into the driver's seat, parked the van in Beltran's driveway, and eventually picked up Rodriguez before fleeing. These facts demonstrate defendants, both active gang members, willfully assisted each other in the commission of the instant offenses.

We conclude the substantive gang charge is supported by substantial evidence. Rodriguez and McEntire were active members of the Fifth Street Bulldog gang, had knowledge of the gang's criminal activities, and willfully assisted each other in the commission of the burglary.

**2.      Sufficiency of the Evidence Supporting the Gang Enhancement (§ 186.22, subd. (b)(1))**

Defendants also challenge the sufficiency of the evidence supporting the gang enhancements (§ 186.22, subd. (b)(1)). Rodriguez contends there is insufficient evidence the crimes were committed for the benefit of or in association with a criminal street gang. McEntire agrees, and adds the Bulldogs are such a loosely organized gang, there can be no gang to associate with during the commission of the crime. While the enhancement was attached to counts 1 through 7, defendants only address the enhancement as it applied to count 1 (burglary). We conclude defendants' contentions are without merit.

Section 186.22, subdivision (b)(1) requires a two-part showing. The People must establish (1) the underlying felony or felonies were committed (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang; and, (2) the defendant harbored the specific intent to promote, further, or assist in any criminal conduct by gang members. Here, the prosecution elected to prove the enhancement based solely on the theory the instant crimes were committed "in association with a criminal street gang." As

11.

such, we need not address defendants' arguments as to whether the crimes were committed "for the benefit of a criminal street gang."

A crime is committed "in association with a criminal street gang" if the defendant relied on his or her common gang membership in committing the offense. (*People v. Albillar*, *supra*, 51 Cal.4th at p. 60.) In *Albillar*, our Supreme Court upheld a section 186.22. subdivision (b)(1) gang enhancement where three gang members sexually assaulted the victim inside an apartment. (*Albillar*, at p. 51.) The defendants had gang tattoos and their shared apartment was saturated with gang paraphernalia, but there was no evidence they displayed gang signs or colors, or that they claimed their gang affiliation during the commission of the assault. (*Id*. at p. 62.)

The appellate court concluded sufficient evidence supported the jury's finding the crimes were committed in association with a gang, as well as for the benefit of a gang. (*People v. Albillar*, *supra*, 51 Cal.4th at pp. 61-62.) Based on expert witness testimony, the defendants committed the sexual assaults in association with a gang because they actively assisted each other in the crime, relied on their loyalties as fellow gang members to ensure they would not inform on one another, and their status as gang members would intimidate the victim, preventing her from contacting police. (*Ibid*.) By committing the crimes together, the defendants also served as witnesses for one another, allowing them to boast about their crimes to fellow gang members, thereby increasing their status within the gang. (*Id*. at. p. 61.)

Similar to *Albillar*, the defendants here committed the instant crimes in association with a criminal street gang because they relied upon their common gang membership to facilitate the crimes. Committing the burglary together permitted Rodriguez and McEntire to multitask during the burglary: Rodriguez acted as the lookout while McEntire broke into Beltran's home. This increased their chance of completing the crime, even though they were ultimately unsuccessful in evading capture. It is also

reasonable to infer that by committing the instant crimes together, defendants could rely on each other's loyalties as fellow gang members not to inform on one another to police.

We also find substantial evidence defendants had the "specific intent to promote, further, or assist" criminal conduct by gang members under the second prong of section 186.22, subdivision (b)(1). This requirement is satisfied where "substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 68; see *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 [committing a crime with other known gang members constitutes substantial evidence "the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime"].) Because McEntire and Rodriguez, both active gang members, intended to and did commit the instant crimes together, there is substantial evidence they acted with the requisite intent "to promote, further, or assist in any criminal conduct by gang members."

McEntire argues: "The fact that Fresno is full of loose associations of criminally minded individuals who identify with the Fresno State mascot does not make every self-interested crime committed by a couple of 'Bulldogs' a gang crime." He explains this is so because the Fifth Street Bulldog gang does not collect taxes, it has no leadership structure, and its governing principle is "Do whatever you want whenever you want." In his reply brief, he adds the Fresno Bulldogs are so loosely organized, it has no apparatus and, therefore, there can be no gang to associate with during the commission of a crime.

It is unclear whether McEntire is attacking the jury's finding the Fifth Street Bulldogs is a criminal street gang, or whether he is arguing that because of the loose structure of the Bulldogs, its members are more likely to commit crimes for personal rather than gang-related reasons. Nonetheless, both arguments are meritless.

"A 'criminal street gang,'… is any ongoing association of three or more persons that shares a common name or common identifying sign or symbol; has as one of its 'primary activities' the commission of specified criminal offenses; and engages through

13.

its members in a 'pattern of criminal gang activity.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 610, italics omitted.)  Detective Cervantes explained the Bulldogs use the Fresno State Bulldog emblem and traditionally wore the color red, but more recently began wearing black and white, or gray.  The Fifth Street Bulldog gang also frequently uses the number "5."  Cervantes also testified three self-admitted members of the Fifth Street Bulldog gang have been convicted of grand theft, assault with a deadly weapon and possession of a firearm by a felon between 2009 and 2011, establishing a pattern of gang activity by the gang's members.  Cervantes's testimony sufficiently establishes the Fifth Street Bulldog gang is a criminal street gang, notwithstanding the fact it may be loosely organized.

The gang enhancement applies where a defendant has "the specific intent to promote, further, or assist criminal conduct by *gang members*" (§ 186.22, subd. (b)(1), italics added), not the gang organization in general.  While this was not a classic gang-related crime, such as intergang rivalry or retaliation, it was, nonetheless, gang related.  Defendants relied on their common gang membership to facilitate the burglary, among other crimes, and committed the offenses with other known gang members, each other.  The loose structure of the Bulldog gang does not alter our conclusion the gang enhancement is supported by substantial evidence.

### 3. Sufficiency of Evidence to Support Presence of Nonparticipant During Commission of the Burglary

Defendants argue the 10-year violent felony enhancement imposed pursuant to section 186.22, subdivision (b)(1)(C) must be stricken because the evidence failed to demonstrate Beltran was inside the residence during the commission of the burglary.  The Attorney General concedes Beltran fled her home before McEntire entered her sliding glass door, but contends the enhancement applies because "McEntire had penetrated the outer boundary of the residence by crossing the threshold beyond the exterior screen door while Beltran was still inside."  We agree with the Attorney General and conclude the enhancement applies.

14.

Section 186.22, subdivision (b)(1)(C) imposes a 10-year enhancement when a defendant commits a violent felony "for the benefit of, at the direction of, or in association with any criminal street gang." A "violent felony," as defined within section 667.5, subdivision (c) includes the commission of first degree burglary when a nonparticipant is "present in the residence during the commission of the burglary." In part 2, *ante*, we concluded the instant crimes were committed in association with a criminal street gang. Here, we address whether the burglary was a violent felony.

First degree burglary occurs when a person enters an inhabited dwelling with the intent to commit a felony. (§§ 459, 460.) "'[A] burglary is complete upon the slightest partial entry of any kind, with the requisite intent ….'" (*People v. Valencia* (2002) 28 Cal.4th 1, 8 (*Valencia*) disapproved on other grounds by *People v. Yarbrough* (2012) 54 Cal.4th 889, 894.)

In *People v. Nible* (1988) 200 Cal.App.3d 838, 844-845 (*Nible*), the appellate court considered whether the defendant's opening of a screen window without penetration of the glass window beyond was sufficient to constitute a burglarious entry. The defendant attempted to remove a screen from outside the victim's open bedroom window using a screwdriver to pry the screen from its frame. (*Id*. at pp. 842-843.) The victim caught the defendant before he could penetrate the space beyond the open window. (*Id*. at p. 842.)

The *Nible* court held penetration of a screen without penetration of a glass window beyond is an entry for purposes of burglary, because a window screen is a permanent part of a dwelling and affords a reasonable expectation of protection from intrusion. (*Nible*, *supra*, 200 Cal.App.3d at p. 845.) The court found the fact the victim's glass window was open irrelevant: "[E]ven an open door or window affords some expectation of protection from unauthorized intrusion because reasonable persons understand the social convention that portals may not be crossed without permission from the structure's owner." (*Id*. at p. 844.) The purpose behind burglary laws, the court observed, is to

protect inhabitants against dangers caused by unauthorized entry, and "inhabitants of a building are just as likely to react violently to an intruder's penetration of their window screen as to the penetration of the window itself." (*Id*. at p. 845.)

Our Supreme Court approved the holding of *Nible* in *Valencia*, *supra*, 28 Cal.4th 1, and set forth a test to determine what constitutes the outer boundary of a building for purposes of burglary. The test is "whether a reasonable person would believe that the element of the building in question enclosed an area into which a member of the general public could not pass without authorization." (*Id*. at p. 12.)

Because a screen door encloses such an area, we find sufficient evidence supports the jury's finding Beltran was present during the commission of the burglary. Beltran testified she was in her living room when McEntire began yanking on her sliding glass door. She remained in her home long enough to make eye contact with McEntire for a few seconds before she fled. Based on her testimony, McEntire's hand penetrated the portal of the sliding screen door while she was still in the home. Further, contrary to Rodriguez's assertion, we find no suggestion in the 911 transcripts that Beltran fled the residence before McEntire began pulling at the handle of the glass door. Although this penetration was slight, and only briefly overlapped with Beltran's presence, it is sufficient.

Defendants assert *Nible* and *Valencia* are inapposite to the instant case because the defendants in both cases removed a window screen. Here, the sliding screen door was already open before McEntire entered Beltran's backyard. The thrust of their argument is this: a homeowner does not have a reasonable expectation of protection from an unauthorized intrusion unless he or she closes the screen door.

We fail to see how the position of the screen door—which is a permanent part of the dwelling—makes any difference as to whether a burglarious entry has occurred. Although *Nible* did state the homeowner's reasonable expectation of protection from unauthorized entry was especially valid under the facts before it because the defendant

16.

had to use a screwdriver to pry the window screen from its frame (*Nible*, *supra*, 200 Cal.App.3d at. p. 845), we do not read *Nible* or its progeny to mean an open screen provides no expectation of protection.

A burglarious entry may occur when an intruder penetrates the space beyond a door or a window whether it is open or closed, because a reasonable person would understand such portals may not be crossed without permission from the owner. (*Nible*, *supra*, 200 Cal.App.3d at p. 844.) A reasonable person would also understand a window screen encloses an area into which a member of the public could not pass without authorization. (*Valencia*, *supra*, 28 Cal.4th at p. 12.) Accordingly, if a door need not be closed when an intruder penetrates the space behind it to constitute a burglarious entry, why must a screen door be?

To hold as much would contravene the general purpose of burglary laws. "'Burglary laws are based primarily upon a recognition of the dangers to personal safety[,] … the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime … and the danger that the occupants will in anger or panic react violently to the invasion ….'" (*People v. Gauze* (1975) 15 Cal.3d 709, 715.) Indeed, the only reason Beltran fled her home before McEntire was able to access the inner part of her residence was because she happened to be in her living room and saw him yanking at the sliding glass door. Had she not seen him, a violent confrontation may have ensued, a possibility she reflected upon during her 911 call: "Oh my God, if I would've stayed inside." Rather than leave out the front door for safety, a different resident might have retrieved a loaded firearm to prevent further entry.

McEntire asserts our holding would permit an intruder to be convicted of burglary merely by crossing an invisible boundary line and, therefore, "imposes criminal liability where knowledge of the nature of the act is lacking." McEntire did not cross an imaginary boundary line—he was in Beltran's backyard and Beltran testified he made eye contact with her as he tried to open the sliding glass door. Further, although the

17.

screen door was open, it was not missing from its track, nor is there any evidence it was obfuscated from view. When police surveyed the home after the burglary, the screen door was half open and pulled out of its track. From this evidence, it is reasonable to infer McEntire saw the screen door as he reached for the inner sliding glass door, but chose to cross the portal of the doorway anyway.[2] We conclude substantial evidence supports the violent felony enhancement.

**4.      Jury Instruction Regarding Presence of Nonparticipant During Burglary**

Defendants argue the trial court erred in instructing the jury regarding the violent felony enhancement (§ 186.22, subd. (b)(1)(C)) because the instruction permitted the jury to find the enhancement true based on attempted burglary. According to defendants, attempted burglary does not support the enhancement. The Attorney General concedes the instruction was erroneous, but asserts the error was harmless. We agree with the Attorney General.

First degree burglary constitutes a violent felony under section 667.5, subdivision (c)(21) if a person, other than an accomplice, is present in the residence during the commission of the burglary. Here, the jury was instructed on burglary, the degrees of burglary, aider and abettor liability, and attempted burglary. With respect to the violent felony enhancement, the jury was instructed as follows:

> "If you find that either defendant is guilty of residential burglary as charged in Count One, or the lesser included offense of attempted residential burglary, which I will instruct you on. You must also decide if the People have proven in the commission of either of those crimes another person other than either defendant was present in the residence during the commission of the burglary *or attempted burglary*. To prove this allegation, the People must prove that, one, the person was present in the residence during the commission [or] *the attempted commission of the*

---

[2]In his reply brief, McEntire argues the prosecutor failed to argue this theory of entry at trial. CALCRIM No. 1700 properly instructed the jury as to when a burglarious entry occurs. Nothing in the record suggests the prosecutor advised the jury entry for purposes of burglary occurred only after McEntire made his way into the inner part of the home.

*burglary*; and the person who was present was not an accomplice to the burglary *or attempted burglary*." (Italics added.)

The instruction above permits the jury to find the violent felony enhancement true based solely on attempted burglary. Section 667.5, subdivision (c)(21), however, does not permit application of the enhancement based on attempted burglary. (*People v. Ibarra* (1982) 134 Cal.App.3d 413, 425 ["Section 667.5, subdivision (a), does not apply to attempts to commit the crimes referred to as violent felonies"].) The only crime of attempt which constitutes a violent felony under the plain language of the statute is attempted murder. (§ 667.5, subd. (c)(12).) The jury instruction given was erroneous.

Nevertheless, the error was harmless. The jury had separate verdict forms for first degree burglary and the lesser included offense of attempted burglary. Both forms required jurors to determine whether another person, not an accomplice to the burglary, was present in the residence during the commission of the offense. According to the verdict forms, the jury found true a nonaccomplice was present during the commission of the offense for both the burglary and attempted burglary. Where an instructional error presents the jury with a legally invalid theory of guilt, but other parts of the verdict demonstrate the jury found the defendant guilty on a proper theory, reversal is not warranted. (*People v. Pulido* (1997) 15 Cal.4th 713, 727.)

The jury did find defendants guilty of the violent felony enhancement based on a proper theory, burglary. At the conclusion of trial, the jury was polled and each juror individually confirmed his or her verdict. As discussed in part 3, *ante*, we concluded this verdict was supported by substantial evidence. Thus, we find no probability the jury would have reached a different verdict had the correct instruction been given, and we conclude reversal is not warranted.

5.      **Trial Court's Duty to Define "Present During the Commission of a Burglary"**

Defendants contend the trial court had a sua sponte duty to define the phrase "present during the commission of a burglary." They argue this term has a technical legal

meaning not conveyed by a reasonable person's understanding of the phrase. We disagree.

The court has a sua sponte duty to clarify terms having a technical meaning peculiar to the law, but it has no duty to define terms commonly understood by those familiar with the English language. (*People v. Bland* (2002) 28 Cal.4th 313, 334.) Absent a request from the defendant, the court has no sua sponte duty to define terms in common usage. (*People v. Eastman* (1993) 13 Cal.App.4th 668, 673.)

Here, it is undisputed the jury was instructed on the elements of burglary and what constitutes an entry for purposes of burglary, pursuant to CALCRIM No. 1700. Although "during the commission of a burglary" was not defined, it is a commonly understood phrase. (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 193 ["jurors would naturally understand 'during the commission of a burglary' to include at least the time that a burglar remains inside the structure after entry"].) The issue, therefore, is whether the term "present" within "present during the commission of a burglary," substantially modifies the phrase such that it has a legal or technical meaning. We conclude it does not.

The generally accepted meaning of the phrase "present during the commission of a burglary" in common parlance amply conveys to the jury the requirement that a nonaccomplice must be within the outer boundaries of the residence when a burglarious entry occurs. (*People v. Singleton* (2007) 155 Cal.App.4th 1332, 1337 (*Singleton*) ["Section 667.5, subdivision (c)(21) is plain on its face, and it requires a person, other than an accomplice, be '*present in the residence* during the commission of the burglary'"].)

Rodriguez argues the trial court, nonetheless, had a duty to define "present during the commission of a burglary" because the jury may have applied the definition of an "inhabited dwelling," the predicate crime of first degree burglary, to the phrase "present

during the commission of a burglary." Rodriguez argues these terms have separate and distinct meanings pursuant to *Singleton*.

In *Singleton*, the defendant argued the trial court erred in failing to define "present in the residence during the commission of the burglary" for purposes of the violent felony enhancement. (*Singleton*, *supra*, 155 Cal.App.4th at p. 1335.) The court held the victim—who was in the hallway outside of an apartment when the burglary was committed—was not "present" within the residence during the commission of the defendant's burglary. As a result, the court did not reach defendant's claim of instructional error. (*Id*. at p. 1340.)

*Singleton*'s discussion of the difference between "inhabited dwelling" pursuant to first degree burglary, and "present in the residence during the commission of the burglary" pursuant to the violent felony enhancement has no bearing on our analysis. The *Singleton* court merely compared these two phrases to explain the terms have separate and distinct meanings. We agree, however, there is simply no evidence the jury here applied the same meaning to both terms. The trial court did not have a sua sponte duty to define "present during the commission of a burglary," and because defense counsel did not request a definition of the phrase, we find no instructional error.

**6.      Trial Court's Duty to Define "In Association with a Criminal Street Gang"**

Defendants contend the trial court erred by failing to provide the jury with a clarifying instruction, sua sponte, on the meaning of the term "in association with a criminal street gang" pursuant to the gang enhancements. They claim under the holding of *People v. Albillar*, "in association with a criminal street gang" has a legal meaning with a specific definition that needed to be defined for the jury by the trial court. We conclude CALCRIM No. 1401 sufficiently instructed the jury on the law, and no further instruction was required absent a request.

"The trial court has a sua sponte duty to give correct instructions on the basic principles of the law applicable to the case that are necessary to the jury's understanding

of the case.  [Citation.]  That duty requires the trial court to instruct on all the elements of the charged offenses and enhancements." (*People v. Williams* (2009) 170 Cal.App.4th 587, 638-639.)  When the terms are used as commonly understood, however, the court has no obligation to define them absent a request for amplification or explanation.

Under *People v. Albillar*, *supra*, 51 Cal.4th at pages 60 and 73, defendants assert the phrase "in association with any criminal street gang" has a technical legal meaning: that defendants relied on their common gang membership and the apparatus of the gang in committing the charged crimes.  We disagree.

The trial court gave CALCRIM No. 1401 on the elements of the criminal street gang enhancement, but there was no definition of the phrase, "in association with a criminal street gang."  Pursuant to CALCRIM No. 1401, the jury was instructed as follows:  "To prove this allegation, the People must prove that the defendant committed or attempted to commit the crime for the benefit of, at the direction of, or *in association with a criminal street gang*; and the defendant intended to assist, further or promote criminal conduct by gang members."  (Italics added.)

Defendants assert the phrase "in association with a criminal street gang" must be defined by the trial court because *People v. Albillar* set forth a specific legal definition of the phrase.  However, the *Albillar* court did not provide a new definition for the phrase, nor did it hold the phrase has a technical meaning.  The *Albillar* court merely discussed the sufficiency of the evidence in establishing the elements of the gang enhancement, concluding:

> "Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together.  They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police." (*People v. Albillar*, *supra*, 51 Cal.4th at pp. 61-62.)

22.

We conclude the trial court does not have a duty under *Albillar* to define the phrase, "in association with a criminal street gang" absent a request by counsel. Since no such request was made, we find no instructional error.

## 7. Defendants' Motion to Bifurcate Gang Enhancement Allegations

Defendants argue the trial court erred in refusing to bifurcate the gang enhancement allegations from the remaining charges. They contend evidence regarding their gang membership had no bearing on whether they committed the underlying offenses and assert they were unduly prejudiced by the admission of such evidence. We conclude there was no error and, in any event, no prejudice.[3]

Section 1044 gives a trial court discretion to bifurcate proceedings. (*People v. Calderon* (1994) 9 Cal.4th 69, 74–75.) With respect to whether bifurcation of gang enhancement allegations generally should be ordered, our Supreme Court has distinguished between a prior conviction allegation, which relates to the defendant's status and may have no connection to the charged offense, and a criminal street gang allegation, which "is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.) Because of this difference, less need for bifurcation of a gang enhancement allegation usually exists. (*Ibid.*) Accordingly, we review the trial court's ruling for an abuse of discretion. (*People v. Rodriguez* (2011) 193 Cal.App.4th 360, 363.)

---

[3]We note footnote 18 in the Attorney General's brief asserts McEntire did not move to sever the substantive gang charge from the remaining charges at trial. At trial, McEntire moved to sever his case from Rodriguez's case. He also moved to strike the gang evidence in connection with the burglary and weapons charges, arguing the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. In the alternative, he sought bifurcation of the gang enhancements. During a hearing on these motions, the trial court asked defense counsel for McEntire whether he was moving to bifurcate the substantive gang charge in addition to the enhancements. Defense counsel replied affirmatively. The court denied the motion.

Technically, substantive counts are severed while enhancement allegations are bifurcated. (*People v. Burnell* (2005) 132 Cal.App.4th 938, 946, fn. 5.) Assuming this issue was preserved for appeal, defendants do not address in their argument whether the substantive gang charge should have been severed. Consequently, we do not address this issue.

23.

If gang enhancement evidence is admissible to prove the underlying charges, """"any inference of prejudice is dispelled.""" (*People v. Cunningham* (2001) 25 Cal.4th 926, 985.)  Evidence of gang membership is admissible if it is relevant to a material issue in the case, it is not more prejudicial than probative, and it is not cumulative.  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).)  Evidence of a defendant's gang affiliation may be admissible to prove motive, intent, modus operandi, or other issues pertinent to guilt in relation to the underlying offense, other than the defendant's criminal disposition.  (*Id*. at p. 224.)

Here, the trial court held some of the gang evidence would be admissible to prove motive and identity in relation to the substantive offenses.  In the 911 transcript, for example, Beltran informed the operator she believed the suspects were Bulldog gang members based on the jersey Rodriguez was wearing and because Rodriguez called McEntire "dog" during the burglary.  The court also explained various exhibits relevant to the underlying crimes depicting gang paraphernalia, including a photograph of the inside of McEntire's van showing a Fresno State Bulldog sweatshirt as well as a Chicago Bulls jersey.  This clothing is consistent with Beltran's description of the suspects' clothing in the 911 report and would be admissible to prove identity.

The court remarked while it could not be unequivocally certain of whether jurors would infer the crimes were gang related, it was fair to infer most of the jurors would be aware of the gang perspective based on the presence of gang paraphernalia and hearing words like "dog" and "Bulldogs."  According to the trial court, the gang implication of the word "dog" would also explain why Rodriguez and McEntire were operating together.  The court recognized a burglary may be motivated by pecuniary gain, but it did not exclude the possibility the motive underlying the instant crimes could be gang related.

We agree this evidence would be admissible to prove the underlying charges, independent of the gang enhancement allegations.  At least some of the evidence was relevant to show defendants' identity as the perpetrators of the burglary and why they

were working together in the commission of the crime. Because the foregoing evidence would have been cross-admissible, any inference of prejudice was dispelled.

Relying on *Albarran*, defendants argue that even if some of the evidence was admissible, the totality of the gang evidence was highly inflammatory and prejudiced the jury. In *Albarran*, the defendant and another male shot at the victim's house with firearms. (*Albarran*, *supra*, 149 Cal.App.4th at p. 217.) The defendant, who was affiliated with the 13 Kings criminal street gang, was charged with a gang enhancement among various substantive offenses. (*Id*. at pp. 219-220.)

Defense counsel made a pretrial motion to exclude evidence of the defendant's gang affiliation, arguing it was irrelevant to the underlying charges and unduly prejudicial. (*Albarran*, *supra*, 149 Cal.App.4th at p. 219.) The prosecution argued the evidence was relevant, and stated "the entire purpose of the shooting was to gain respect and enhance the shooters' reputations within the gang community, and to intimidate the neighborhood …." (*Ibid*.) During a hearing on the motions, a witness for the prosecution opined the shooting was gang related because there were two shooters involved and the crime would intimidate people. (*Id*. at p. 220.)

The trial court held the gang evidence was relevant not only to the enhancement, but also to the motive and intent for the shooting. (*Albarran*, *supra*, 149 Cal.App.4th at p. 220.) The jury found the defendant guilty of the charged offenses and found true the gang enhancement allegation. (*Id*. at p. 222.) Pursuant to a motion by the defendant for a new trial, the trial court determined insufficient evidence supported the gang enhancement and dismissed it, but denied the motion as to the underlying charges. (*Ibid*.)

On appeal, the court determined the defendant's motion for new trial should have been granted as to all charges. (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.) The court held even if some of the gang evidence were relevant to motive and intent, other evidence admitted was extremely inflammatory and had no connection to the charged offenses. (*Id*. at pp. 227–228.) The court explained certain gang evidence, including references to

25.

the Mexican Mafia, a threat to murder police officers, and evidence of crimes by other gang members, "was irrelevant, cumulative and presented a substantial risk of undue prejudice." (*Id*. at p. 228.) This evidence was characterized as "overkill" and served only to show the defendant's criminal disposition. (*Ibid.*)

*Albarran* addressed "one of those rare and unusual occasions where the admission of [gang] evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.) The instant case is not "one of those rare and unusual occasions." (*Ibid*.)

Cervantes's expert testimony regarding defendants' gang affiliation is distinguishable from the highly inflammatory and prejudicial evidence in *Albarran* for several reasons.

First, much of the gang evidence here was cross-admissible to prove defendants' guilt as to the underlying charges. In *Albarran*, the court held the proffered gang evidence had no connection to the underlying charges and stated it was "irrelevant." (*Albarran*, *supra*, 149 Cal.App.4th at p. 228.)

Second, in *Albarran*, the prosecution's witness testified at length about the identity of other gang members and the numerous crimes they committed (*Albarran*, *supra*, 149 Cal.App.4th at p. 227). Here, Cervantes's discussion of crimes committed by other Bulldogs was limited and did not suggest defendants were involved in the predicate offenses. He testified only to the names of other self-admitted Bulldogs, the dates of their criminal convictions, and the crimes they were convicted of.

Finally, Cervantes's testimony regarding defendants' jail classifications was also limited. No specific details pertaining to the reason for defendants' incarcerations were given to the jury. To the extent the evidence may have implied defendants were persons of bad character or had a criminal disposition (see *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345), the court instructed the jury it was prohibited from considering the evidence for this purpose. (CALCRIM No. 1403.) We presume the jury is

26.

reasonable and followed the trial court's instruction. (*People v. Anzalone* (2013) 56 Cal.4th 545, 557.)

While this instruction may be meaningless where the evidence proffered is extraordinarily prejudicial and has little relevance to guilt, as in *Albarran*, that was not the case here. Defendants have failed to establish the trial court abused its discretion by denying their motion to bifurcate the gang enhancement allegations.

**8.     Presentence Credits**

McEntire independently contends if this court finds the violent felony enhancement should be reversed, he is entitled to presentence custody credits. In part 3, *ante*, we found no basis to conclude the enhancement should be reversed. Thus, we do not reach this argument.

**9.     Illegal Possession of Ammunition**

In defendants' final claim on appeal, they assert their sentence for illegal possession of ammunition must be stayed because they were already punished for possession of a firearm by a felon. They contend punishment for both offenses contravenes section 654. The Attorney General agrees, as do we.

Section 654, subdivision (a) provides the following, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Thus, when a single act is charged as the basis for multiple convictions, the defendant can be punished only once. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.)

In *People v. Lopez* (2004) 119 Cal.App.4th 132, 137-139, the defendant was convicted and sentenced, in part, for possession of a firearm by a felon and illegal possession of ammunition. On appeal, he argued his sentences contravened section 654 because possession of the firearm and the ammunition were part of an "indivisible course

of conduct." (*Lopez*, at p. 137.)  The appellate court agreed, reasoning because the unlawful ammunition was loaded in the gun, the defendant's sentence for unlawful possession of ammunition should have been stayed because he had only one intent:  to possess a loaded firearm.  (*Id.* at p. 138.)

In the instant case, the evidence showed the ammunition was loaded inside the firearms.  Nonetheless, defendants were punished for possession of a firearm by a felon (§ 29800, subd. (a)(1), counts 2 and 3), and illegal possession of ammunition (§ 30305, subd. (a), counts 4 and 5).  As a result, defendants' punishment as to counts 4 and 5 must be stayed.

### DISPOSITION

The trial court is ordered to prepare an amended abstract of judgment with service to all appropriate agencies to reflect the following modification:  the terms imposed on defendants for unlawful possession of ammunition (§ 30305, subd. (a), counts 4 and 5) are stayed.  In all other respects, the judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
FRANSON, J.

28.

Filed 5/16/16

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL RAYMOND McENTIRE et al.,<br><br>    Defendants and Appellants. | F067666<br><br>(Super. Ct. No. F13901539)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PARTIAL PUBLICATION [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on April 20, 2016, be modified as follows:

1. On page 2, after the heading **INTRODUCTION**, insert the following paragraph:

A resident is home alone lying on her couch. Her dog barks. The resident looks out to her backyard and sees a male intruder there. The intruder approaches the home and tries to open the sliding glass door, which is beyond the door's screen. The resident picks up her dog and her wireless phone. She dials 911. Shortly after fleeing her home to the front yard, she hears glass shatter. Does sufficient evidence support the finding the resident was present during the commission of the burglary? We conclude it does, even though the screen was partially open, because the intruder penetrated the space beyond the screen in attempting to open the sliding glass door while the resident was still inside her home.

2. It appears that part of the nonpublished opinion filed in the above entitled matter meets the standards for publication specified in California Rules of Court, rule

8.1105(c), and it is further ordered the opinion be certified for publication with the exception of parts 1-2, and 4-9 of DISCUSSION.

There is no change in the judgment.  Appellant's petition for rehearing is denied.


_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
FRANSON, J.