[Crim. No. 13405. Fourth Dist., Div. One. July 28, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
HECTOR PEDRO IBARRA, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Barbara A. Smith, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Bernard A. Delaney and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

COLOGNE, J.—Hector Pedro Ibarra was charged with murder (Pen. Code, § 187),[1] attempted murder (§§ 664, 187) and attempted robbery (§§ 664, 211), with personal firearm use as to each count (§ 12022.5), and a prior violent felony conviction in Texas within the meaning of section 667.5, subdivision (a). Ibarra admitted the prior violent felony before trial and a jury found him guilty of voluntary manslaughter, attempted voluntary manslaughter and attempted robbery, with personal use of a firearm in each count. The trial court sentenced Ibarra to a total determinate term of 13½ years, and he appeals.

In the evening of January 23, 1981, Ibarra gave a ride to Gerald H., known as "Terry," a 17-year-old transvestite prostitute who was hitchhiking the streets of Oceanside looking for "tricks." On Terry's suggestion, Ibarra agreed to pay Terry $25 for an act of oral copulation. When Ibarra stopped the car, he pulled a loaded revolver out, pointed it at Terry and demanded money and an act of oral copulation. Terry showed Ibarra he had only change in his purse. Ibarra had Terry move next to him and Ibarra put his arm around Terry, stuck the revolver in Terry's ribs, then fired a shot into the passenger door. Terry was upset and crying, and Ibarra drove him to the Pacific Motel where Terry lived with his 23-year-old lover, David Stevens.

At the motel, Terry told Stevens and others there what happened (though Terry changed the attempted robbery to an attempted rape) and gave the description of Ibarra and his car. Stevens was upset and wanted to go after Ibarra, but Terry talked him into calling the police. After the group spoke to the police about the incident, Stevens and his friend, Ken Prior, armed themselves with a Bowie knife and half of a nunchaku[2] weapon (a stick with a chain hanging from it) and went to downtown Oceanside "to get" the assailant. Terry and Michael S., known as "Michelle" and Prior's 16-year-old transvestite lover, went

---

[1]All statutory references are to the Penal Code unless otherwise specified.

[2]Defined in section 12020, subdivision (d)(2).

downtown separately and located Ibarra's car. Michelle called the police who came and told Prior and Michelle to leave for their own safety and to avoid interfering with the police. Prior conveyed this information to Stevens who continued to watch Ibarra's car.

Ibarra returned to his car and was approached by Stevens and Prior. Stevens told Ibarra he knew about the incident with Terry, and Ibarra began walking away on the crowded sidewalk. Stevens and Prior followed, telling Ibarra repeatedly the police had been called and to wait for the police. Ibarra told them he wanted no trouble, just leave him alone, and kept walking away. After Stevens and Prior had followed Ibarra a total of 10 minutes, Stevens moved quickly in front of him near an abandoned laundromat at a dark intersection and the three of them stopped in position for encounter. Ibarra had his back to the laundromat and stood facing Stevens and Prior who were about six feet to either side of him and eight feet from each other. Ibarra asked whether they would let him go if he gave them some money and Stevens responded they would if he gave him $400. Ibarra said all he had was $20. Stevens told him that was "too bad, we'll just have to wait for the police," and Prior asked Ibarra to take his hands out of his pockets.

At that point, Ibarra pulled the revolver from his right pocket and, bracing his right hand with his left, pointed it at Prior who kneeled to the ground. Using the same bracing position, Ibarra then aimed at Stevens and pulled the trigger, but the gun did not fire. Stevens opened his jacket and said he did not believe the gun was loaded. Ibarra shot again, putting a bullet through Stevens' heart and lungs, killing him instantly.

Ibarra then fired three rounds at Prior, but missed. He ran from the scene and burst into a nearby apartment, telling the occupants to call the police because someone was trying to kill him. The occupants obliged his request by flagging down an officer on patrol who arrested Ibarra.

Ibarra admitted the shooting but claimed self-defense. He testified Stevens had his hand behind him and moved a half step toward him just before he pulled the trigger the second time. Ibarra said he thought the victims were armed since they had come after him knowing he had a gun, and he feared for his own safety when they stopped him, causing him to think they might beat him or rob him. He never saw the partial nunchaku Prior carried or the Bowie knife which was found in a locked

open position with its blade protruding from Stevens' right rear pocket. He told police he was surprised he missed shooting Prior. On cross-examination, Ibarra testified, in part:

"Q. Now, at the time you pulled the trigger, you didn't know that the hammer was going to strike an empty cylinder; did you?

"A. No, I didn't.

"Q. So at the time you pulled the trigger the very first time, it was your intention to kill David Stevens; wasn't it?

"A. No, it wasn't.

"Q. Well, you were holding the gun just three or four feet from his chest; weren't you?

"A. That's right.

"Q. And you were pointing it at his chest?

"A. That's correct.

"Q. Your intention was not to kill David Stevens?

"A. I didn't really think about it. I was going to shoot him.

"Q. Your intention was to shoot him?

"A. That's correct."

■ Ibarra contends the trial court erred in failing to instruct *sua sponte* on the necessarily included offenses of involuntary manslaughter (as to the murder charge) and assault with a deadly weapon (as to both the murder and attempted murder charges).

With respect to the involuntary manslaughter instruction, Ibarra claims he "unequivocally testified he had no intent to kill Stevens; he only intended to shoot him." He points out an intent to kill is required for voluntary manslaughter and, if the jury could have found he killed Stevens both without malice and without intent to kill, it could have returned an involuntary manslaughter verdict. He notes the jury was

instructed an honest but unreasonable belief in the necessity to defend one's self negates malice and reduces the offense to manslaughter (CALJIC No. 5.17;[3] *People* v. *Flannel* (1979) 25 Cal.3d 668, 674-683 [160 Cal.Rptr. 84, 603 P.2d 1]), and the jury was instructed on voluntary manslaughter. The jury's voluntary manslaughter verdict, he asserts, shows the jury found him credible in claiming he honestly but unreasonably perceived a need to shoot in self-defense. However, he claims the lack of an involuntary manslaughter instruction placed the jury in a difficult position under the instructions as given because, if the jurors also believed his testimony he had no intent to kill, they would have to acquit him completely when in their view he killed without legal justification, i.e., an objectively reasonable claim of self-defense.

Aside from the fact we do not believe the evidence supported giving the involuntary manslaughter instruction, the theory Ibarra presents was by no means a principle of law "'*commonly* or closely and openly connected with the facts of the case before the court.'" (*People* v. *Flannel, supra*, 25 Cal.3d 668, 681, quoting from *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) Not until November 1979, did the so-called unreasonable belief rule become a general principle having the effect of eliminating the malice element necessary to find any degree of a murder and thus leaving voluntary manslaughter, the remaining form of intentional killing, as the homicide on which instructions were required (*People* v. *Flannel, supra*, 25 Cal.3d 668, 679, 682-683). We note the defense of diminished capacity will give rise to the need to instruct on involuntary manslaughter since this particular defense can have the effect also of negating the intent to kill element of a homicide with the result even voluntary manslaughter is not a possibility (see *People* v. *Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762]). However, that the unreasonable belief rule can have an effect of negating the intent to kill element, similar to that we find in the diminished capacity defense, is not established or even suggested by any case cited to us by the parties. Under these circumstances, the idea propounded by Ibarra can hardly be viewed as a general principle of law to which there attaches a duty to instruct *sua sponte* (see *People* v.

---

[3]The instruction reads: "A person who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully, but does not harbor malice aforethought and cannot be found guilty of murder. This would be so even though a reasonable man in the same situation seeing and knowing the same facts would not have had the same belief. Such an honest but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter."

*Flannel, supra*, 25 Cal.3d 668, 680-683). On this basis, no duty to instruct *sua sponte* on the offense of involuntary manslaughter existed.

■ On the matter of evidentiary support for the involuntary manslaughter instruction, the general rule is the trial court is required to give an instruction as to lesser included offenses "only if there is substantial evidence to support a jury's determination that the defendant was in fact *only* guilty of the lesser offense" (*People* v. *Ramos* (1982) 30 Cal.3d 553, 582 [180 Cal.Rptr. 266, 639 P.2d 908]; italics added). The single piece of evidence of lack of intent Ibarra cites is his negative answer to the one question, quoted above, about whether it was his intention to kill David Stevens. The next succeeding four questions and answers make his answer to the first question equivocal and erase any substantiality that might otherwise be attributed to his answer to the first question. From Ibarra's immediately succeeding testimony he intended to shoot Stevens as Ibarra held his gun pointing at Stevens' chest and within three or four feet of it, the inference is strong Ibarra intended to kill Stevens. When this testimony is combined with the uncontradicted and largely admitted evidence of Ibarra's fresh knowledge the gun was loaded, his use of a bracing technique for steady aim and his pulling the trigger a second time while in this deadly stance, the conclusion is inescapable he intended to kill Stevens. At a minimum, his denial of intent to kill cannot be deemed unequivocal. It must be viewed to the contrary.

His one line denial of intent to kill takes on much the same lack of substantiality as did the testimony of the defendant in *People* v. *Flannel, supra*, 25 Cal.3d 668. There, Flannel sought to show reversible error due to the absence of a *sua sponte* instruction on diminished capacity as a result of intoxication. The Supreme Court held the giving of such an instruction was not supported because the defendant presented no substantial evidence of intoxication. The court outlined the evidence and concluded as follows: " . . . . First, defendant consumed relatively small amounts of alcohol over a long period of time. In the early morning, somewhere about 10 a.m., defendant drank about four tall cans of beer and a shot or two of gin. He then went shopping with his girlfriend, and ate a sandwich for lunch. Between 2:30 and 4 that afternoon defendant drank a couple of beers and a shot of whiskey. . . .

"Second, all five eyewitnesses to the shooting—all friends of defendant presumably acquainted with his demeanor—testified variously that defendant 'wasn't drunk,' he was 'acting normal,' he was not acting

'goofy,' the alcohol had 'no effect.' Two police officers arriving at the scene testified that they could recall nothing indicating the defendant was 'under the influence.' This showing of sobriety contrasts with the presentation in other cases in which a defendant's claim of intoxication finds corroboration by independent witnesses. . . .

"Finally, defendant's testimony regarding his own intoxication is equivocal; 'normally I think I wouldn't have reacted like I did. Maybe . . . I wasn't normal. I was drunk, I would suppose'; defendant did not know what he was doing, not 'totally,' it 'could be possible' that otherwise he would have walked away from Daniels. In short, the evidence shows no diminished capacity due to intoxication; rather, as defense counsel stated in his closing argument to the jury, 'Mr. Flannel thought that the effect on him might have been in the form of his willingness to stay there rather than to run.'" (*People* v. *Flannel, supra*, 25 Cal.3d 668, 685-686.)

Here, the factual picture from which the inference of intent is to be drawn is essentially admitted as well as corroborated, and thus very clear. Ibarra's own testimony as to his mental state is contradictory and therefore equivocal. Under these circumstances, we hold, similarly to *Flannel*, Ibarra presented no substantial evidence of lack of intent to kill which would support giving *sua sponte* an instruction on involuntary manslaughter.

■    With respect to Ibarra's contention the jury should also have been instructed *sua sponte* on assault with a deadly weapon as a necessarily included offense to the charges of murder and attempted murder which were accompanied by personal firearm use allegations (§ 12022.5),[4] there is a split of authority in the Courts of Appeal and the Supreme Court now has the issue under consideration.

The original line of cases holds the firearm use allegation is not to be considered in determining whether the accusation encompasses a lesser included offense; the allegation merely provides for an enhancement and does not create a substantive offense; the instruction need not be

[4]Section 12022.5 reads: "Any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of two years, unless use of a firearm is an element of the offense of which he was convicted. [¶] The additional term provided by this section may be imposed in cases of assault with a deadly weapon under Section 245."

given *sua sponte* (*People v. Orr* (1974) 43 Cal.App.3d 666, 673-674 [117 Cal.Rptr. 738], charge of assault with deadly weapon plus § 12022.5 allegations, no error in lack of instruction on lesser crime; accord *People v. Benjamin* (1975) 52 Cal.App.3d 63, 71-72 [124 Cal. Rptr. 799], charge of murder with § 12022.5 allegations, no error in lack of instruction on assault with deadly weapon (ADW); *People v. Wilson* (1976) 62 Cal.App.3d 370, 373-374 [132 Cal.Rptr. 813], charges of attempted murder and ADW with § 12022.5 allegations, no error in conviction of both attempted voluntary manslaughter and ADW; *People v. Salas* (1978) 77 Cal.App.3d 600, 607 [143 Cal.Rptr. 755], hg. den., charge of robbery with great bodily injury allegations, no error in lack of instruction on ADW (in form of assault by force likely to produce great bodily injury) and other alleged lesser crimes; *People v. Cole* (1979) 94 Cal.App.3d 854, 861-862 [155 Cal.Rptr. 892], overruled on another point in *People v. Lohbauer* (1981) 29 Cal. 3d 364 [173 Cal.Rptr. 453, 627 P.2d 183], charge of assault with intent to murder with § 12022.5 allegations does not give notice accusation includes ADW; *People v. Tolver* (Cal.App.), hg. granted Dec. 23, 1981, (Crim. 22407) charges of robbery with § 12022.5 allegation and ADW, no error in conviction of both robbery and ADW which is not a lesser included offense to the robbery charged).

Holding personal firearms use allegations give rise to consideration whether assault with a deadly weapon is a lesser included offense of the main charge was *People v. McGreen* (1980) 107 Cal.App.3d 504 [166 Cal.Rptr. 360] (hg. den.), involving a charge of robbery with section 12022.5 allegations and holding it is error not to instruct on ADW, but not holding the error is reversible (accord *People v. Wolcott* (Cal.App.) hg. granted Oct. 22, 1981, (Crim. 22295) charge of robbery with § 12022.5 allegations, the Court of Appeal holding it is reversible error not to instruct on ADW; *People v. Myers* (1981) 125 Cal.App.3d 735, 740-744 [178 Cal.Rptr. 259], charge of attempted murder with § 12022 (armed and used a deadly weapon) and § 12022.7 (inflicted great bodily injury) allegations, upholding a conviction of ADW as a lesser included offense). Without particularly discussing the *Wilson* case, *supra*, 62 Cal.App.3d 370, decided by the same district and division of the Court of Appeal, and apparently without concern for the confusion in the trial courts it was engendering by its decision against precedent in this commonly arising situation,[5] the court in *McGreen* constructed a theory justifying the result it reached which it summarizes as follows:

---

[5]In *Myers, supra*, 125 Cal.App.3d 735, Gardner, P. J., speaking for the court, acknowledges (at p. 744): "[W]e are certainly opening a can of worms insofar as the trial

"i. Simple assault is a necessarily included offense of robbery as a matter of law (see cases cited above).

"ii. The allegation that McGreen used a firearm in the commission of the robbery is a part of the charge of robbery (§ 969d).

"iii. The 'use' allegation is part of the 'specific language of the accusatory pleading.' (*Marshall, supra* [*People* v. *Marshall* (1957) 48 Cal.2d 394 (309 P.2d 456)].)

"Therefore, the charge of robbery with a 'use' allegation encompasses assault with a deadly weapon." (*People* v. *McGreen, supra*, 107 Cal. App.3d 504, 512.)

While there is conceptual soundness to the theory, as Gardner, P. J., notes in *Myers* (see fn. 5, *ante*, p. 422), we do not believe it is any more sound than the *Orr* position an enhancement allegation does not create a substantive offense.[6] We choose to follow the *Orr* case.

---

courts are concerned. *Sua sponte* instructions have already become a nightmare. We add one more burden to the already crushing load the trial courts must carry. Now, in addition to searching the substantive offense in the accusatory pleading for *sua sponte* possibilities, the court must study and consider the enhancement provisions. This is no trifling matter since almost all assaultive crimes include some enhancement allegations. So while our position may be conceptually sound, it is pragmatically troublesome. The important factor is that the Supreme Court act and act promptly in this troublesome field because this whole mess must leave the trial courts in a state of considerable bewilderment."

[6]*Orr*'s view is: "An allegation of applicability of Penal Code section 12022.5 is not part of a charge of an offense itself. It merely provides for added penalty in crimes in which a firearm is used and is a legislatively mandated method of requiring and providing for such penalty.... We now further hold, as a logical consequence of this rule, that an allegation of firearm use for purposes of Penal Code section 12022.5 is not to be considered in determining whether the accusation encompasses a lesser included offense." (*People* v. *Orr, supra*, 43 Cal.App.3d 666, 673-674.)

Though not following *Orr*, in *People* v. *Myers, supra*, 125 Cal.App.3d 735, the court, by Gardner, P. J., said of *Orr* (at pp. 743-744): "[T]he rationale of *Orr* and its progeny is not entirely without merit. [¶] Enhancement allegations are not a part of the specific language of the accusatory pleading which sets forth the substantive offense. *Marshall* [*People* v. *Marshall*, 48 Cal.2d 394], on which *McGreen* relied, did not specifically hold that *all* language of the accusatory pleading must be considered. *Marshall* permitted a review of the language of the offense which was pled. Also, numerous cases have held that enhancement allegations do not prescribe an offense but merely relate to the penalty to be imposed. [Citations.] For example, in *Grilli* [*People* v. *Superior Court* (*Grilli*) (1978) 84 Cal.App.3d 506 (148 Cal.Rptr. 740)], the court held that the enhancements may not be attacked in a Penal Code section 995 motion as that in no way involves an offense but merely prescribed a penalty to be imposed."

In any event, when one considers the murky judicial history represented by the cases above cited, it is at once apparent the idea an assault with a deadly weapon becomes a lesser included offense of any violent crime charged with a personal firearm use enhancement allegation is not a general principle of law governing the case, i.e., the idea is not a principle of law commonly or closely and openly connected with the facts of the case before the court (*People* v. *Flannel, supra,* 25 Cal. App.3d 668, 681; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Wade, supra,* 53 Cal.2d 322, 334). Since the theory is not such a "general" principle, there is no duty to instruct on the theory *sua sponte* (*People* v. *Flannel, supra,* 25 Cal. 3d 668, 680-682). Moreover, under the facts as we have discussed them, it cannot be said there is any "evidence from which the jury could reasonably conclude that defendant was only guilty of assault with a deadly weapon and not [voluntary manslaughter]" (*People* v. *Ramos, supra,* 30 Cal.3d 553, 582).

■ Ibarra contends his prior conviction for attempted murder was not a violent felony within the meaning of section 667.5, subdivision (a), and the court erred in imposing a three-year enhancement instead of the one-year enhancement proper under section 667.5, subdivision (b).[7] The admitted prior conviction was an attempted murder committed in Texas in 1977, punishable by a sentence of two to twenty years in prison, and for which Ibarra served more than one year in prison.

---

[7]Section 667.5 reads, in part: "Enhancement of prison terms for new offenses because of prior prison terms shall be imposed as follows:

"(a) Where one of the new offenses is one of the violent felonies specified in subdivision (c), in addition and consecutive to any other prison terms therefor, the court shall impose a three-year term for each prior separate prison term served by the defendant where the prior was one of the violent felonies specified in subdivision (c); provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of 10 years in which defendant remained free of both prison custody and the commission of an offense which results in a felony conviction.

"(b) Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence is imposed, in addition and consecutive to any other prison terms therefor, the court shall impose a one-year term for each prior separate prison term served for any felony; provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of five years in which defendant remained free of both prison custody and the commission of an offense which results in a felony conviction.

"(c) For the purpose of this section, 'violent felony' shall mean any of the following:

"(1) Murder or voluntary manslaughter.

"              .     .     .     .     .     .     .     .     .     .     .     .     .     .

"(7) Any felony punishable by death or imprisonment in the state prison for life.

"(8) Any other felony in which the defendant inflicts great bodily injury on any person other than an accomplice which has been charged and proved as provided for in

Section 667.5, subdivision (a), does not apply to attempts to commit the crimes referred to as violent felonies. Just as the law grants relief to one who pleads guilty where the statute under which he is convicted did not prohibit his conduct (see *In re Crumpton* (1973) 9 Cal.3d 463, 467-468 [106 Cal.Rptr. 770, 507 P.2d 74]; *People v. Mutch* (1971) 4 Cal.3d 389, 396 [93 Cal.Rptr. 721, 482 P.2d 633]), so also must the law grant relief where there is an admission to an additional punishment provision which is inapplicable to the admitted facts (see *People v. Cheri* (1981) 127 Cal.App.3d 280, 284-285 [179 Cal.Rptr. 423]). In such a case there is no legal basis for imposing the additional punishment. The three-year additional term enhancement imposed under section 667.5, subdivision (a), cannot stand in Ibarra's case.

As to proper disposition, Ibarra states his "prior conviction justified only a one year enhancement under Penal Code section 667.5, subdivision (b), and the Court should modify the judgment accordingly," and in his statement of contention he refers to "the one year proper under Penal Code section 667.5 subdivision (b)." Thus, there is no factual or legal question the Texas conviction and sentence comes within section 667.5, subdivision (b), as a "prior separate prison term served for any felony." Nevertheless, in order to assure proper proof is given or a proper admission is taken under principles enunciated in the *Boykin-Tahl* line of cases (*Boykin v. Alabama* (1965) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]), and otherwise consistently with constitutional principles, it is necessary to permit appropriate amendment of the information as well as admonishments and the taking of another admission or, alternatively, the proving up of the correct prior conviction.

Finally, Ibarra contends the trial court's dual and triple use of facts requires a remand for resentencing. In pronouncing judgment, the trial

---

Section 12022.7 on or after July 1, 1977, or as specified prior to July 1, 1977, in Sections 213, 264, and 461, or any felony in which the defendant uses a firearm which use has been charged and proved as provided in Section 12022.5.

"The Legislature finds and declares that these specified crimes merit special consideration when imposing a sentence to display society's condemnation for such extraordinary crimes of violence against the person.

". . . . . . . . . . . . . . . . . . . .

"(f) A prior conviction of a felony shall include a conviction in another jurisdiction for an offense which if committed in California is punishable by imprisonment in state prison provided the defendant served one year or more in prison for such offense in the other jurisdiction. A prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense which includes all of the elements of the particular felony as defined under California law provided the defendant served one year or more in prison for such offense in the other jurisdiction."

court stated the particular terms, with enhancements and consecutive sentencing for the three convictions, and the additional punishment term under section 667.5. It summarized the total term is 13 years, 6 months and said:

"I impose the foregoing terms in state prison for the following reasons: The defendant is ineligible for probation; that there is a great likelihood that if the defendant is not imprisoned that defendant will be a danger to society and to other members of society; that the crimes herein are of a severe nature; that the defendant was armed with and used a firearm in the commission of the crimes; that the defendant has an adult prior record, indicating a pattern of increasing violence and increasing serious criminal conduct; that the defendant has been on probation in the State of Texas and violated that probation.

"And that while the defendant has a history of some training in mechanical skills that his training has not been put to good use in the sense that his employment has been somewhat erratic and uncertain.

"And further more [*sic*] that the defendant indicates a callousness and lack of remorse. . . ."

■    The rule is "[r]easons for imposing consecutive terms, as well as aggravating base terms, must be expressly stated" (*People* v. *Whitehouse* (1980) 112 Cal.App.3d 479, 486 [169 Cal.Rptr. 199]), and "[a] trial court commits reversible error in sentencing a defendant to the upper term without stating the facts and reasons for such sentence as mandated by section 1170, subdivision (b), and California Rules of Court, rules 439(c) and 443." (*People* v. *Davis* (1980) 103 Cal.App.3d 270, 279-280 [163 Cal.Rptr. 22].)

As is clear from the form of sentencing done by the trial court, quoted above, it cannot be determined what factor or factors the court was relying upon, for example, in selecting the upper term or for imposing consecutive sentences. Effective appellate review is not possible (see *People* v. *Edwards* (1976) 18 Cal.3d 796, 804 [135 Cal.Rptr. 411, 557 P.2d 995]) and it may well be the trial court improperly made a dual use of facts although that cannot be determined on this record (see § 1170, subd. (b); Cal. Rules of Court, rule 441(c)). To be meaningful, the sentencing reasons given by the trial court must be susceptible to application to the particular term or count as to which the sentence is then being pronounced. The case must be remanded for resentencing.

The matter is remanded for further proceedings with respect to determination of the prior felony conviction and resentencing consistent with this opinion. In all other respects, the judgment is affirmed.

Brown (Gerald), P. J., and Staniforth, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 22, 1982.