Filed 3/30/22

# CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHNATHAN HOWARD KIGER,<br><br>    Defendant and Appellant. | E075551<br><br>(Super.Ct.No. SWF1907584)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.

Affirmed as modified in part, reversed in part, and remanded with directions.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Arlene A. Sevidal and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, and IV.

1

The ex-girlfriend of defendant Johnathan Howard Kiger testified that he got drunk and started an argument with her. During the argument, he slapped her, pushed her head against a car, dragged her by the leg, and finally strangled her into unconsciousness. There was evidence that defendant had committed three prior assaults — one on the same girlfriend and two on previous girlfriends; the assaults on the previous girlfriends had resulted in a conviction in 2009 for domestic battery and in 2016 for attempted domestic battery.

In a bench trial, defendant was found guilty of domestic battery with a prior (§ 273.5, subd. (f)(1))[1] and assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)), each with a domestic violence great bodily injury enhancement (§ 12022.7, subd. (e)). One "strike" prior (§§ 667, subds. (b)-(i), 1170.12) and one prior serious felony conviction enhancement (§ 667, subd. (a)) were found true. Defendant was sentenced to a total of 16 years in prison, along with the usual fines, fees, and ancillary orders.

Defendant now contends, among other things, that there was insufficient evidence of domestic battery with a prior because his only sufficiently recent prior conviction was for an attempt, not for a completed crime.

In the published portion of this opinion, we will hold that the trial court erred by finding defendant guilty of domestic battery with a prior when his only relevant prior

---

**1** This and all further statutory citations are to the Penal Code, unless otherwise specified.

conviction was for attempted domestic battery. In the unpublished portion, we will reject defendant's other contentions. Accordingly, we will modify the judgment and remand for resentencing.

I

STATEMENT OF FACTS

A.  *August 2019:  The Charged Offense*.

1.  *S.U. at Chris Burgers*.

On August 19, 2019, around 3:00 a.m., victim S.U.[2] knocked on the window of the Chris Burgers restaurant in Winchester. She was wearing a tank top, even though it was cold out. She yelled, "I'm pregnant and I'm bleeding." The restaurant was not open yet. The owner called 911, then handed the phone outside to her.[3]

2.  *S.U.'s statement to the police*.

Around 4:00 a.m., two sheriff's deputies responded to the 911 call. Deputy Brian Hinkle interviewed S.U. briefly. She was upset. She said her boyfriend had slapped, dragged, and strangled her. She had lost consciousness.

There was "a reddish discolored abrasion on the right of her neck," blood on her lip, and a mark on her forehead. Deputy Hinkle took photos of her injuries.[4]

---

[2]  We use initials for all alleged victims in this case to accord them protective nondisclosure.  (Cal. Rules of Court, rule 8.90(b)(4).)

[3]  A recording of the 911 call was played at trial but has not been transmitted to us.

[4]  These photos have not been transmitted to us.

3

### 3. *S.U.'s statement at the hospital.*

S.U. was taken by ambulance to a hospital. Deputy Randy Cunanan interviewed her there.[5] He noticed redness on both sides of her neck, as well as a small cut to her inner lip and a scratch on the top of her head.

A specialist in emergency medicine examined and treated S.U. S.U. said she had been "swaddled [*sic*; sc. "straddled"?], strangled, hit, slapped around." She lost consciousness and came to on the ground.

She said her neck was tender and painful. She had a minor abrasion to her inner lip and another minor abrasion to her forehead. The doctor found "no physical manifestation of her being choked . . . ." For example, she found no bruising. However, three to five hours would have been enough time for redness or swelling to subside. She also found no petechial hemorrhaging, but there was no "hard-and-fast" rule as to whether someone who was strangled into unconsciousness would have petechial hemorrhaging.

S.U. mentioned that she had "an 85 percent blockage" of a coronary artery. Stress combined with such a blockage could cause loss of consciousness.

A nurse with expertise in strangulation testified that more than 50 percent of persons who report having been strangled have no visible physical manifestations of it.

---

[5] A video of the interview was played at trial but has not been transmitted to us.

Moreover, the injuries can be so subtle that a doctor without expert training may miss them.

        4.    *S.U.'s testimony at trial*.

S.U. testified that in June 2019, she and defendant met through a dating application. They started dating in July. They spent every weekend together.

In July or August 2019, S.U. learned that she was pregnant. She told defendant the baby might be his or might be her ex's. Defendant wanted her to get an abortion. She refused. He was upset.

They saw each other four or five more times. He told her "every time he had an opportunity" to get an abortion. He called her names — "dopehead," "bitch," and the N-word. He said "he would bury [her] in the desert."

On August 18, defendant picked S.U. up and took her to his house. He drank until he passed out. S.U. was asleep in the bedroom when he turned on the light and started yelling at her about how she did not spend enough time with him.

Defendant ordered S.U. to "get the fuck out of [my] house." He offered to drive her home, but she refused because he had been drinking. She tried to call an Uber, but she did not have enough money in her account. She went to a neighbor's house to ask if she could wait there, but he refused.

S.U. asked defendant if she could sleep outside on the porch until dawn, and he agreed. Ten minutes later, defendant let her back inside so she could go to the bathroom. When she came "back outside" (apparently meaning back out on the porch), they started

5

arguing again.  Defendant told her again to leave and tried to grab her arm.  She "snatched away" and started "flailing [her] hands."

Defendant slapped her and pushed her.  She fell to the ground and "curl[ed] into a ball" as he kicked her in the stomach.  She was crying and asking him to stop.  When she sat up, he pushed her forehead; the back of her head hit his car.  He grabbed her leg and dragged her "a few inches."

She got up.  He ordered her back into the house.  There, they "exchanged words."  Defendant grabbed her by the neck with his left hand and started slapping her with his right hand.  She bit his right arm.  She said, "I'm not afraid of you."  He then started to strangle her.  She could not breathe and lost consciousness.  When she woke up, she was on the floor and he was yelling at her.  She saw that the front door was open, so she ran out and went to Chris Burgers, which was the nearest business.

Later, she realized that she had wet her pants while unconscious.  It hurt to swallow, her voice was "[a] bit" raspy, and she had a headache for two days.

On August 22, at defendant's request, S.U. went with him to a welfare office.

B.     *Prior Domestic Violence Incidents.*

1.     *First uncharged prior:  2009 incident involving D.T.*

In 2009, defendant pleaded guilty to misdemeanor domestic battery on victim D.T.

2.     *Second uncharged prior:  2015 incident involving S.T.*

In 2014 or 2015, victim S.T. met defendant though a dating website.  He "wanted to be with [her]," and "if [she] didn't oblige," he would "harass" her.  Once, he phoned

6

her 75 times in one night. Another time, when she asked him to leave, he went out and slept in his car; at 2:00 or 3:00 a.m., he got up and rang her doorbell 50 times.

They lived together for about five months. Defendant was a "heavy drinker." "When he was under the influence of alcohol, you just never knew what would set him off." He was "physically violent" with her multiple times.

On Halloween in 2015, defendant was drinking wine and beer. S.T. was sitting on the couch and defendant was in the kitchen; they were just talking. Suddenly, he "lung[ed]" at her, grabbed her by the neck with both hands, threw her to the floor, and started strangling her. She could not breathe. He was saying, "You stupid bitch. I hate you." He dragged her into the bedroom. She blacked out. When she came to, he started strangling her again and dragged her into the bathroom. S.T. said, "You're gonna kill me." Defendant replied, "No, I'm not, because I love you," then let her go. She called 911.

S.T. had a sore throat for two weeks. At the time of trial, she had "permanent red marks" on her neck from burst blood vessels. In 2016, defendant pleaded guilty to attempted domestic battery on S.T.

According to defendant, S.T. had assaulted him multiple times. On Halloween 2015, she got angry at him and started slapping him. Defendant arranged for a friend to pick him up in the morning and went to sleep on a couch. S.T. called the police, who arrived and arrested defendant for domestic violence. He pleaded guilty to a lesser

charge on the advice of his attorney, because S.T. was "a pathological liar," so "there was no hope for [him]."

A long-time friend of defendant testified that he saw scratches on defendant's neck and face when he was living with S.T.

### 3. *Third uncharged prior: 2019 incident involving S.U.*

In early August 2019, defendant got upset with S.U.; he claimed that she was not spending enough time with him. He slammed her against the wall. She then left.[6] She was not injured. They "didn't talk for a bit," but eventually they got back together again.

### C. *Defense Evidence.*

### 1. *Defendant's testimony.*

Defendant denied demanding that S.U. have an abortion. They did argue about whether he was the father.

On the weekend of the charged offense, S.U. came to his house and "pretty much slept the entire time she was there." Defendant was drinking beer. He denied passing out; rather, he slept odd hours because he had insomnia.

Around 1:00 a.m., he woke S.U. up and asked her to watch a movie with him. She then asked if he wanted her to get an abortion. When he said he did, she was indignant. He tried to avoid an argument. He suggested that she walk home and think about it.

---

[6] Defendant's brief says that this incident happened on the day S.U. learned she was pregnant. That is incorrect. It happened sometime before that.

She "charg[ed]" at him. He put up his arms to defend himself. She grabbed his right arm and bit it. He pushed her face away. She started hitting him, then bit his left hand. He pushed her away again.

S.U. gave him a "weird look," laughed "like 'ah-ha,'" then ran out of the house. He started packing her things. When she came back in, he told her "to get the fuck off [his] property."

She said she was going to call the police and say he had beaten her. He took out his cellphone and said, "We'll call them together . . . ." She went out of the house again. He left her things out on the porch and locked all the doors. The next day, he dropped her things off at her house. His injuries were visible in photos taken three weeks later, at his arraignment.

On August 22, at her request, he gave S.U. a ride to the welfare office. Later, she told him that she had fallen "on her face" when climbing over his gate. She also said that she had called an ambulance because she thought it would give her a ride to a hospital near her home, but instead it took her in the other direction.

2. *Other defense witnesses*.

Defendant's neighbor testified that on August 19, S.U. came over to his trailer and said she and defendant had been arguing. She had no visible injuries. He told her it was not safe to walk home or to wait outside. He offered to let her call someone for a ride. Instead, she left.

9

The next day, defendant showed him a bite mark on his chest and a bite mark on his forearm.

A day and a half later, he saw defendant and S.U. together and they were both smiling and happy.

When defendant was arrested, the neighbor came outside. Defendant explained that "he had ordered [S.U.] out of the house, and she got crazy and bit him." Defendant also told the arresting officer that "[h]e couldn't get her off of him and . . . he grabbed her by the neck, she got fucking bitchy [and] ran outside . . . ."

Defendant's father testified that, after defendant's arrest, he phoned S.U. to find out what happened. She said they had a fight and defendant told her to leave. She went to the neighbor's trailer, then ran back into defendant's house and "attack[ed] him and bit him . . . ."

## II

### EVIDENCE OF PRIOR DOMESTIC VIOLENCE INCIDENTS

Defendant contends that the trial court erred by admitting the evidence of prior domestic violence incidents.

A.    *Additional Factual and Procedural Background.*

In its trial brief, the prosecution moved to admit evidence regarding defendant's two prior convictions for domestic violence against D.T. and S.T. Defendant, in his trial brief, objected to this evidence as more prejudicial than probative. (Evid. Code, § 352.)

10

Before trial, the People additionally moved to admit evidence regarding defendant's uncharged domestic violence against S.U. The trial court acknowledged that defendant's objection also applied to this evidence.

The trial court admitted the evidence. It explained that "its probative value outweighs any prejudice to defendant. [¶] If this were a case where the prior alleged victims had been beaten senseless, or got bloody and broken and needed significant hospitalization, then the argument could be made that that was so prejudicial . . . in terms of just the disparity between the acts, . . . I could see myself possibly excluding them for those reasons. But in this case the Court . . . has not heard of anything . . . that would lead the Court to believe that, if I hear this evidence . . . , I'm just going to be so shocked and overcome . . . that I'm going to be unable to make a fair and just decision . . . ."

After the trial court's ruling, defendant stipulated that he had pleaded guilty to misdemeanor domestic battery against D.T. and attempted domestic battery against S.T.

B.     *Discussion*.

Defendant did not forfeit his present contention by stipulating that he had been convicted. At that point, the trial court had already ruled that these incidents were admissible. "'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.' [Citation.]" (*People v. Calio* (1986) 42 Cal.3d 639, 643.)

"Evidence Code section 1109 allows for the admission of evidence of a defendant's commission of prior acts of domestic violence as propensity evidence when the defendant is accused of 'an offense involving domestic violence.'" (*People v. James* (2010) 191 Cal.App.4th 478, 479-480, fn. omitted.)

"Admission of evidence of prior acts of domestic violence under [Evidence Code] section 1109 is . . . subject to the limitations of [Evidence Code] section 352. [Citation.]" (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095; see also Evid. Code, § 1109, subd. (a).) Evidence Code section 352 provides that: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"'"'We will not disturb a trial court's exercise of discretion under Evidence Code section 352 '"*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice."'"' [Citation.]" (*People v. Steskal* (2021) 11 Cal.5th 332, 357.)

Evidence that defendant had a propensity to commit acts of domestic violence was substantially probative. "'In the determination of probabilities of guilt, evidence of character is relevant. [Citations.]' [Citation.] Indeed, the rationale for excluding such evidence is not that it lacks probative value, but that it is too relevant." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 179.)

Here, it was even more probative than usual, because the trial was a credibility battle — S.U.'s word against defendant's. Defendant's claim that it was S.U. who attacked him, standing alone, was not incredible. Hence, it was particularly useful for the prosecution to be able to show that defendant had form for this kind of thing.

The 2015 incident involving D.T. was particularly probative because it was similar to the charged offense in several respects. Defendant had been drinking; he strangled the victim and also dragged her. As the prosecutor argued, "Mr. Kiger is a documented strangler." "[T]hat is something the Court can also take into consideration when understanding if Ms. S[.]'s account of what happened is truthful."

"Finally, the independent sources of the evidence . . . increased the probative value of the evidence. [Citation.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1287.)

On the other side of the ledger, the prior incidents were not particularly prejudicial. Defendant argues that they were prejudicial precisely *because* this was a close credibility call; thus, the propensity evidence was likely to tip the scales against him. Indeed, in finding defendant guilty, the trial court cited the propensity evidence. However, ""prejudice" in the context of Evidence Code section 352 is not synonymous with "damaging": it refers to evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome.' [Citation.]" (*People v. Steskal*, *supra*, 11 Cal.5th at p. 363.) The trial court used the propensity evidence precisely the way Evidence Code section 1109 allowed it to.

"Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). [Citations.]" (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

The 2015 incident was less violent than the charged offense and thus less inflammatory. Admittedly, the 2009 and 2019 incidents were not particularly similar to the charged offense. There was no evidence at all of what defendant actually did in 2009; there was just the bare fact of the conviction.[7] In 2019, he "slammed" S.U. against a wall. However, he did not strangle her, and she was not injured. Still, these incidents were probative to show that defendant had a propensity to domestic battery. Precisely because they were not similar — and indeed were apparently very minor — they did not cause any prejudice to defendant beyond the highly similar 2015 incident.

Arguably, the 2009 incident, on its own, would have been unduly remote. "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under [section 1109], unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subd (e).) It is not clear whether the 2009 incident happened more or less than ten years before the charged

---

[7] In its trial brief, the prosecution made an offer of proof that, after an argument, defendant grabbed D.T. by her ankles as she was walking upstairs. She fell, and her face hit a window ledge; her face was injured. These facts were not particularly similar to the charged offense. However, they also were not particularly inflammatory or otherwise prejudicial. Hence, they do not change the analysis.

offense.  However, the 2009, 2015, and 2019 incidents, taken together, showed that defendant's propensity to domestic violence was persistent and of long standing.  (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 534.)  There was no possibility of confusion, particularly as this was a bench trial.  The evidence showed that defendant had been convicted and punished for two of the three incidents.  Although he had not been punished for the 2019 incident, it was so minor that no reasonable trier of fact would want to punish defendant for it rather than for the charged offense.  The presentation of the evidence did not take up much time at all.

We therefore conclude that the trial court did not err by admitting evidence of the three prior instances of domestic violence.

III

CONVICTION OF DOMESTIC BATTERY WITH A PRIOR

BASED ON A PRIOR ATTEMPT

Defendant contends that there was insufficient evidence of domestic battery with a prior because his only relevant prior conviction was for an attempt crime.

"The proper interpretation of a statute is a question of law we review de novo. [Citations.]"  (*People v. Lewis* (2021) 11 Cal.5th 952, 961.)  Thus, such an issue can be raised for the first time on appeal.  (*Prang v. Los Angeles County Assessment Appeals Board No. 2* (2020) 54 Cal.App.5th 1, 15.)  Moreover, a contention that a judgment is not supported by substantial evidence can always be raised for the first time on appeal. (*People v. Butler* (2003) 31 Cal.4th 1119, 1126.)

15

Section 273.5, subdivision (a) defines the crime of domestic battery. It says: "Any person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim [in a specified intimate relationship with the defendant] is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000), or by both that fine and imprisonment."

Section 273.5, subdivision (f)(1) provides enhanced penalties for domestic battery when the defendant has a qualifying prior conviction. As relevant here, it says: "Any person convicted of violating this section for acts occurring within seven years of a previous conviction *under subdivision* (*a*) . . . shall be punished by imprisonment in a county jail for not more than one year, or by imprisonment in the state prison for two, four, or five years, or by both imprisonment and a fine of up to ten thousand dollars ($10,000)." (Italics added.)

The evidence at trial showed that defendant had a conviction *more than* seven years earlier for *completed* domestic battery (§ 273.5, subd. (a)) and a conviction *less than* seven years earlier for *attempted* domestic battery (§§ 273.5, subd. (a), 664).

Case law consistently holds that an attempt does not constitute a prior conviction unless the relevant statute expressly includes attempts.

*People v. Jernigan* (2014) 227 Cal.App.4th 1198 involved section 1170.126, which makes an inmate ineligible for resentencing if he or she has a prior conviction for forcible oral copulation. (§ 1170.126, subd. (e)(3), incorporating § 667, subd.

16

(e)(2)(C)(iv)(I), incorporating Welf. & Inst. Code, § 6600, subd. (b), incorporating a forcible violation of former § 288a.)  In *Jernigan*, the defendant had a prior conviction for *attempted* forcible oral copulation (former § 288a, subd. (c)(2)(A); § 664, subd. (a)).  (*Jernigan*, *supra*, at p. 1202.)

The appellate court held that the prior conviction for attempt did not make the defendant ineligible for resentencing.  "By its plain terms, Welfare and Institutions Code section 6600, subdivision (b) defines a 'sexually violent offense' to include forcible oral copulation.  But 'sexually violent offense' clearly does not include the offense of *attempted* forcible oral copulation.  'Sexually violent offense' as statutorily defined does not include an *attempt* to commit any of the listed sexual offenses.  [Citation.] . . .  Under the plain language of the governing provisions, defendant's prior conviction of *attempted* forcible oral copulation does not render him ineligible for resentencing under section 1170.126."  (*People v. Jernigan*, *supra*, 227 Cal.App.4th at pp. 1207-1208.)

*People v. Reed* (2005) 129 Cal.App.4th 1281 is similar.  It involved Health and Safety Code section 11370.2, subdivision (a).  At the time, that subdivision provided an enhancement applicable to certain drug offenses when the defendant has a "prior felony conviction of, or [a] prior felony conviction of conspiracy to violate," Health and Safety Code section 11351 (possession of a controlled substance for sale).  The defendant had a prior conviction for *attempted* possession of a controlled substance for sale.  (*People v. Reed*, *supra*, at p. 1283.)

The appellate court held that the enhancement did not apply (*People v. Reed*, *supra*, 129 Cal.App.4th at pp. 1283-1285): "Although certain crimes and a conspiracy to commit certain crimes are listed, an *attempt* to commit a certain crime is not listed. An attempt to commit a crime is neither a completed crime nor a conspiracy to commit a crime. An attempt is an offense 'separate' and 'distinct' from the completed crime. [Citations.]" (*Id*. at p. 1283; see also *Garcetti v. Superior Court* (2000) 85 Cal.App.4th 1113, 1118 & 1118 fn. 4 [attempted lewd act on a child did not trigger Sexually Violent Predator Act, Welf. & Inst. Code, § 6600, subd. (a)]; *People v. White* (1987) 188 Cal.App.3d 1128, 1133-1134 [attempted robbery did not trigger habitual offender statute, § 667.7] (*White*), disapproved on other grounds in *People v. Wims* (1995) 10 Cal.4th 293, 314, fn. 9; *People v. Ibarra* (1982) 134 Cal.App.3d 413, 424-425 [attempted murder did not trigger three-year prior prison term enhancement, § 667.5, subd. (a)] (*Ibarra*); see generally *People v. Cummings* (2021) 61 Cal.App.5th 603, 609-612.)

The People concede that these cases are all well and good, but they argue, essentially, that domestic violence is special: "[T]he Legislature has recognized the unique nature of domestic violence, carving out special exceptions for it in the Family Code, Evidence Code, and Penal Code, all of which intertwine to hold perpetrators of domestic violence accountable, particularly repeat offenders, and to protect their victims."

But that is precisely the point: Whenever the Legislature wants there to be an exception, it can carve one out. Here, it did not do so. It first enacted the domestic

18

violence with a prior provision in 1999.  (Stats. 1999, ch. 662, § 9.5, p. 4940.)  That was after the decisions in *White* and *Ibarra*, *supra*.  "The Legislature is presumed to be aware of '"judicial decisions already in existence, and to have enacted or amended a statute in light thereof.  [Citation.]"'  [Citation.]"  (*People v. Giordano* (2007) 42 Cal.4th 644, 659.)  Thus, had it wanted attempted domestic battery to count as a prior for purposes of domestic battery with a prior, it could and would have said so.

We therefore conclude that defendant's conviction of domestic battery with a prior must be reduced to simple domestic battery, and we must remand for resentencing.

IV

THE IMPOSITION OF A RESTITUTION FINE WITHOUT A HEARING ON

ABILITY TO PAY

Defendant contends that the trial court erred by imposing fines and fees without holding a hearing on his ability to pay.

A.     *Additional Factual and Procedural Background*.

The trial court found that defendant was unable to pay booking fees (former Gov. Code, § 29550.2) or presentence investigation costs (§ 1203.1b).  Defense counsel then asked, "Okay.  What about the court fees?"  The trial court replied, "Those are mandatory."

It imposed an $80 court operations assessment (§ 1465.8) and a $60 court facilities assessment (Gov. Code, § 70373).  It also imposed a $300 restitution fine (§ 1202.4), a $300 parole revocation restitution fine, stayed (§ 1202.45).

19

B.    *Discussion.*

Defense counsel forfeited this contention by failing to object below.  (*People v. Torres* (2020) 47 Cal.App.5th 984, 991; see generally *People v. Scott* (1994) 9 Cal.4th 331, 353.)

In his opening brief, defendant claims his counsel "sought to strike the fees and fine . . . ."  Merely asking, "What about the court fees?" is hardly an objection or a request to strike.  In his reply brief, defendant argues that an objection would have been futile in light of the trial court's statement that "court fees" were "mandatory."[8]  "We disagree.  The trial court's belief that [the fees were mandatory] does not indicate that the trial court could not have been persuaded otherwise after objection.  The futility argument is particularly unconvincing to the extent defendant argues that the trial court's reasoning was marred by legal error; if informed of an actual legal error by an objection, presumably the court would have revisited its reasoning and, thus, its conclusion." (*People v. Baker* (2021) 10 Cal.5th 1044, 1111.)

On remand, defendant will be free to request an ability-to-pay hearing and to object to the imposition of any fines or fees without such a hearing.  We express no opinion on the merits of any such request or objection.

---

[8]    His opening brief almost makes this argument, but not quite.  It says that the objection that defense counsel supposedly did make "was thwarted by the trial court's mis-perception that the fees and fines were mandatory."

20

## V

## DISPOSITION

Defendant's conviction of domestic battery with a prior (§ 273.5, subd. (f)(1)) is reduced to simple domestic battery (§ 273.5, subd. (a)).  The judgment with respect to the conviction, as thus modified, is affirmed.  The judgment with respect to the sentence is reversed.  On remand, the trial court must resentence defendant accordingly.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ

P. J.

We concur:

CODRINGTON

J.

SLOUGH

J.