Filed 3/9/26  P. v. Rufo CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DOMINICK JEFFERY RUFO,<br><br>Defendant and Appellant. | F088008<br><br>(Super. Ct. No. 21CR-05897A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Stephanie L. Jamieson, Judge.

William W. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

A jury convicted defendant Dominick Jeffery Rufo (defendant) of second degree murder (Pen. Code, § 187, subd. (a)) and found true an allegation he personally discharged a firearm that caused great bodily injury or death (*id*., § 12022.53, subd. (d)) after he shot someone in a diner following an altercation. (Undesignated statutory references are to the Penal Code.) The altercation involved the homicide victim, his wife, and his wife's mother, Balinda, on one side, and the ex-wife of Balinda's brother, Karen B., on the other side. Karen's daughter, codefendant Brandy Bettencourt, and Bettencourt's boyfriend, defendant Rufo, responded to the diner to help Karen. A video recording of the argument showed Bettencourt and defendant enter the diner, defendant pointing a laser-assisted gun at the victim, firing the gun three times at the victim when he stood up, apparently striking him in the abdomen, the chest and the head, killing him. During trial, defendant testified, in part, that the shooting was a "reaction more than a thought" and he was not "a hundred percent aware of the fact [he] was doing it." The defense also introduced expert testimony on psychology in use-of-force situations. The trial court instructed the jury on first degree murder, second degree murder under actual and implied malice theories, and voluntary manslaughter under heat of passion and imperfect self-defense theories. The court dismissed the firearm enhancement in the interest of justice in light of mitigating factors including defendant's lack of a prior criminal record and sentenced him to 15 years to life in prison.

On appeal, defendant contends the trial court prejudicially erred in failing to instruct the jury, sua sponte, on involuntary manslaughter. He further contends the lack of such instruction violated his constitutional due process rights.

We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and Brandy Bettencourt (Bettencourt)[1] were charged with the murder of Jasper G.[2] with malice aforethought (§ 187, subd. (a)). It was further alleged that defendant personally and intentionally discharged a firearm which caused great bodily injury and death to Jasper (§ 12022.53, subd. (d)).

Before trial, defendant filed a trial brief detailing multiple motions in limine. He moved the court, in part, "to instruct the jury on lesser offenses including second-degree murder, voluntary manslaughter, and involuntary manslaughter." The court reserved ruling on this motion.

Defendant also filed a *Trombetta/Youngblood* motion on the grounds the People admitted the knife the victim, Jasper, wore on his hip at the time of the shooting was not collected as evidence; it was released to the decedent's family. (See *Arizona v. Youngblood* (1988) 488 U.S. 51; *California v. Trombetta* (1984) 467 U.S. 479.) Defendant asserted, "This missing knife is exculpatory as an important part of the deadly force threat that [defendant] perceived when he encountered [Jasper] in the [diner]." He moved to dismiss the charges against him under the *Trombetta/Youngblood* doctrine or another appropriate remedy. The People responded that the release of the knife to the victim's next of kin was not in bad faith and pursuant to *Arizona v. Youngblood*, *supra*, 488 U.S. 51, it did not create a due process violation. They also asserted there was sufficient proof of the knife's size, nature, and existence through 35 photographs, and three video angles and there was no apparent exculpatory value. The knife at issue was ultimately produced and examined by defense counsel. The court held an Evidence Code section 402 hearing on the matter. The court concluded that law enforcement violated a

---

[1] Bettencourt is not a party to this appeal. Bettencourt's surname is shown as "Bettencourt-Costa" in some portions of the record.

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

duty to preserve the knife, stating "in a case in which there's an altercation, and one person ends up dead, the presence of weapons on the decedent is readily relevant." It found the appropriate remedy was to permit full cross-examination about this knife and to give curative jury instructions regarding late discovery and the failure to preserve evidence.

**Prosecution Evidence**

On September 19, 2021, Balinda H., her daughter Tanya G., and Tanya's husband, Jasper, went to have a drink at a diner in Hilmar, California. Upon entering the bar, they saw Karen B., Balinda's brother's ex-wife. Balinda denied having any problems with or animosity toward Karen but stated Tanya did not like Karen. She testified her group exchanged pleasantries with Karen and then sat down at the bar. Karen held her phone up and was telling the person she was video-chatting with the names of Jasper, Balinda, and Tanya. Tanya told Karen to "[s]top the drama." (Boldface omitted.) Karen did not stop what she was doing, and she and Jasper began arguing. Jasper was loud and angry. He told Karen, "Shut the fuck up, bitch." (Boldface omitted.) According to Balinda, Karen "just kept doing it all, being nasty," "[j]ust harassing." At some point, Jasper said, "Bring whoever the fuck you want down here. I'll fight the whole bar." (Boldface omitted.) The bartender told them to "[s]top arguing" but they did not. (Boldface omitted.) The bartender asked Karen to leave. Jasper then asked for the bill and said, "Let's go." Jasper walked to a table behind them. The door to the bar opened. Balinda saw Tanya throw a glass at the door. Then, Balinda heard two gunshots, but she did not know who was shooting. She saw Jasper fall to the ground and Tanya immediately went toward Karen. Tanya grabbed Karen by the hair and threw her to the floor. Balinda saw that Bettencourt had a gun and Balinda began wrestling her. According to Balinda, Bettencourt said, "Do you want to be next." Tanya eventually let Karen get up and Karen

4.

and Bettencourt left. Balinda testified Jasper had a knife on his hip that day, but he did not pull it out in any way or grab it.

On September 19, 2021, Officer S. Machado with the Merced County Sheriff's Office responded to the shooting at the diner. Upon entering the diner, Machado saw Jasper lying on his back in a puddle of blood. Jasper appeared to be dead; he had a "hole in his chest and in his head." There was a knife in a sheath on Jasper's hip. Machado could not recall if the knife was secured with a clasp but from looking at a picture, he thought it looked like there was a strap around the white handle.

Detective L. Ortiz was the lead detective in this matter. During the course of his investigation, he learned there had been a potential argument between Jasper and Karen at the bar. Someone in the bar recorded a video of the argument, which was recovered and played for the jury. During the argument someone is called a poor name.

Ortiz identified multiple still images and video surveillance footage from the diner on the night of the incident. Viewing the surveillance footage, Ortiz identified the victim, Jasper, and Jasper's wife, Tanya, who was sitting right next to him in the images. He explained Balinda was seated to the left of Tanya. The shooting of Jasper was captured in the footage. In reviewing the surveillance footage, Ortiz denied seeing Jasper reach for a weapon and he testified Jasper did not make any aggressive actions before being shot. He explained that defendant can be seen with a silver handgun in his hand.[3] A laser can be seen on the ground, and later, on the lower portion of Jasper's midsection. Then, a light can be seen which, Ortiz testified, he believed to be a muzzle flash based on his training and experience, indicating the firearm was fired.

---

[3] Ortiz testified a firearm, a 357-Rhino revolver, with a detachable green laser attached to it was recovered during a subsequent search of defendant's house. He explained that a button had to be pushed to activate the laser on the gun. Ortiz further stated that the recovered firearm appeared to be consistent with the firearm that can be seen in defendant's hand in images from the shooting.

Ortiz testified he did not specifically direct someone to photograph the knife. He testified he "was able to determine, very early on in the investigation, that the knife wasn't actually used during the incident."

Ortiz testified defendant and Bettencourt were ultimately located in Mexico and they had to be extradited back.

The parties stipulated to the truth of the statements in Jasper's certificate of death, including the cause of death, as determined by the coroner, that the cause of death was gunshot wounds of the head, chest and abdomen.

**Motion for Directed Verdict**

On November 14, 2023, defendant moved for a directed verdict pursuant to section 1118.1, asserting there was insufficient notice to support a charge of first degree murder, noting the "operative accusatory pleading does not allege that the killing of Jasper [G.] was committed upon premeditation and deliberation." He also argued the evidence was insufficient to establish premeditation and deliberation or express malice. He also asked the court to grant a directed verdict of acquittal on the lesser included offense of second degree murder. The prosecutor asserted "the video speaks for itself" and it was a question for the jury as to whether the evidence supported a reduction of the charge from murder to manslaughter. Defendant went "into the bar, pulled out a gun within a second of coming in the bar, activated the laser on his gun with his off hand, and, with his right hand, fired three shots, fled the bar." He noted, "[t]his all happened in a matter of seconds," and "activating the laser" showed "premeditation and deliberation." The court denied the motion for a directed verdict of acquittal as to defendant.

Codefendant Bettencourt, also moved for a directed verdict pursuant to section 1118.1, asserting there was no evidence she aided the commission of the life-endangering act. The court granted Bettencourt's motion for a directed verdict.

**Defense Evidence**

The defense called Karen B. to testify. On September 19, 2021, Karen had a few drinks during the day and then went to the diner by herself to have some more. Karen was at the diner for approximately 30 minutes when Tanya, Balinda, and Jasper walked in. Karen denied exchanging greetings with the group or conversing with them. Karen testified she called her daughter Brittany because she felt uncomfortable after they walked in based on the way they "were looking and . . . not really engaging." She also stated she started talking to a man who spoke Portuguese, so she called her son-in-law who speaks Portuguese to translate. Jasper started yelling at Karen and calling her names. Karen stated she did not know what Jasper was so upset about. Karen told Brittany she was uncomfortable and she wanted to go home. Karen was scared to walk home by herself; she would have to travel in front of Jasper's family's house to get home. Bettencourt came into the bar and said, "Let's go, Mom." Karen stood up. Karen testified Tanya laughed and said, "That's who you called," and then Tanya threw a drink that went in Karen's face. Karen put up her hand to block it because she did not want it to hit Bettencourt. Karen testified, "[T]he next thing I knew, I was being attacked." Tanya lunged at Karen and was beating her up; Karen testified she felt her life was in danger. Karen testified she heard three gunshots after Tanya lunged at her, though the surveillance footage showed Jasper was shot first. Tanya eventually let go and Karen got up and followed Bettencourt.

Ashley B. was bartending at the diner on the day of the shooting. She recalled Karen and Jasper arguing and Jasper saying, "Shut the fuck up, bitch." (Boldface omitted.) Jasper also said, "I'll kick your fucking teeth in," and "I'll beat the whole fucking bar up." (Boldface omitted.) Ashley heard Karen say to someone on the phone, "They are lucky you can't come down here." Ashley intervened and at some point she asked Karen if she would like to "take a step outside." Ashley also spoke to Jasper; he calmed down and said, "Sorry." Jasper asked for the check. Ashley did not feel the need

to summon help to protect anyone's safety or security. At some point she saw someone throw a drink and a glass and then Ashley heard a gunshot. The shooting surprised Ashley.

Brittany B. testified her mother, Karen, called her on September 19, 2021, at around 6:00 or 6:30. Initially, Brittany's husband was translating for Karen because she was speaking to man in a bar who spoke Portuguese. Then, Karen told Brittany that "[s]omebody just walked in," and she could not "say their names right now." Brittany said, "Flip it to FaceTime. You don't have to tell me. Just show me." Karen called Brittany on FaceTime and was trying to get the camera flipped around; Brittany heard a man yelling at Karen, "You better watch yourself. You are going to get what's coming to you." Then, the phone went dead. Brittany took that "as a threat on [her] mom's life." So, Brittany called her sister, Bettencourt, to go pick up Karen. Karen called Brittany again and Brittany told her Bettencourt was on her way. Karen said, "Tell her to hurry." Brittany texted Bettencourt, "Hurry."

Tony V. was at the diner on the day of the shooting. He recalled hearing a "gentleman arguing with the lady in the corner." Tony heard him say, "Shut up before I knock your teeth down your throat."

Defendant testified on his own behalf. He explained that he went to Turlock High School before joining a military academy. After he graduated, defendant went into the Army in September 2010. He went to basic training as a combat engineer before taking on different domestic assignments. He earned an expert nine-millimeter badge. Defendant left the military in June 2013, returned to Turlock, and began working in welding and sheet metal fabrication. In 2015, he took a job in Ceres where he was the head of welding before getting a job in Stanislaus County. Defendant moved to Hilmar in 2017 or 2018. He owned a .38-special revolver which is the weapon he used in the shooting at issue. He also had additional guns—a .500-Magnum, a 357-Chiappa Rhino, an AK-47, and an AR-15. Defendant testified he had never previously been in trouble

with the law or been arrested. He was allowed to own firearms and practiced shooting weekly at the shooting range on the ranch where he lived. He "used all [his] firearms all the time." Defendant testified he would buy attachments and parts for all his weapons and interchange things. He put a laser on the pistol approximately a week before the incident.

Defendant met Bettencourt in November or December 2020 and they started dating. Approximately a month or two after they started dating, Bettencourt moved into defendant's house to help him after he shattered his clavicle and could not move his arm. At the time of the shooting, they had been together for almost a year. Defendant had met Bettencourt's mother three times, but it was mainly just defendant and Bettencourt. They "liked to stay secluded and just live on the land."

On September 19, 2021, defendant and Bettencourt went to church and shopping for the week. When they returned home, defendant gathered their firearms and ammunition and put them in the truck to go to the shooting range. After they returned from the shooting range, defendant had a beer and fell asleep. He awoke to Bettencourt telling him they "have got to go right now . . . to go get [her] mom." "Someone is threatening [her]." Defendant got up, put on his flip-flops, and went to his truck. Bettencourt told defendant her sister was on the phone with their mother and heard a guy screaming, yelling, and threatening her life, saying that he is "going to hurt her" and "[s]he's going to get what she deserves." They got in the truck and defendant headed to the diner "as fast as [he] can go." Bettencourt tried to call her mother, but she could not get a hold of her. She told defendant her sister was scared for her mom's life. Defendant said Bettencourt "freaked [him] out." He was sleeping and she woke him up "frantic with this information" and he had "no clue what's going on." Defendant parked the car right in front of the front door and grabbed his pistol; his weapons were still in the truck from earlier. Defendant explained, "all this information I am getting, it's bad. I better have something to protect myself in case this is a bad situation." "A man is threatening a

9.

woman. In any case that just seems all bad to me. Kicking her teeth down the throat, I would never threaten anybody with anything like that. So it sounds serious enough that her sister, in Nevada, is scared. Her mom is scared. [Bettencourt] is freaked out. I am, for sure, on edge now."

As defendant shut his car door, Bettencourt was almost by the front door. Defendant was a little bit behind Bettencourt as she walked inside. Defendant opened the door and it was dark inside. Bettencourt approached her mother on the right and defendant instantly saw "a male with a knife on his hip." Defendant testified, "the first thing my eyes go to is there's a weapon right there." Defendant was "on edge because it's right next to her mom. This is the guy. This is the guy with the threats. This is the guy, now, with a knife." Bettencourt is just getting up to the bar and "[s]he gets a glass thrown at her instantly." Defendant thought, "Oh, my gosh. These people are serious." He testified, at that point, it became clear "they are going to act on these [threats] now. They are showing me that they are violent." Defendant pulled his firearm and was "trying to make sure that he does not go anywhere near that knife." Defendant stated, in his experience and training in the military, "a knife is just as deadly as a firearm . . . [a]nd you can inflict great bodily damage, with a knife, very fast." "[A] glass comes and smacks [Bettencourt] in the face and breaks on the ground." Defendant kept the firearm in line with Jasper to make sure that Jasper did not brandish the knife. Defendant saw Jasper reach across the bar and "his hand instantly goes straight to the knife." Defendant testified, "they had shown me, the threats they were making good on, I couldn't let it happen." Defendant shot his gun, he "thought only one time."[4] His memory was "very vague" from "that point after." He turned and left the bar. He testified, "I am baffled

---

[4] On cross-examination, defendant stated Jasper's "hand was on his knife before the first round left the firearm." Defendant admitted the video showed the laser of his gun was on Jasper's midsection before Jasper's hand reached anywhere near the right side of his body.

that I even did that because the whole purpose of it is to make sure they are protected in this whole thing.  And now I have just left them there.  In no rational thinking is that okay with me." Defendant stated he was "in sheer panic and shock" and "just started taking off in [his] truck."  He realized he had all these weapons in his truck and "this is bad." He went home and got all his weapons out of the truck.  He did not "want to come into contact with the law and them think that [he is] more violent than [he is]."  Bettencourt called defendant asking him where he was, saying, "You left us."  Defendant told her he was on his way and did not mean to leave her.  He drove back to pick up Bettencourt and Karen and then went right back home.  Bettencourt and Karen were screaming and crying in the car.  Defendant was "trying to figure out what happened" and thinking, "I have got to turn myself in."  Bettencourt had a mark under her eye from the glass hitting her face. Defendant took Karen home and told Bettencourt, "I have to turn myself in."  Bettencourt told him, "We have to do it right.  You need to get a lawyer."  Ultimately, defendant did not get a lawyer and he decided to go with Bettencourt to Mexico.  He testified Bettencourt "was scared," he "loved her," and "didn't want to leave her" and "didn't want her to deal with retaliation from the other family."  Defendant denied going to the diner with the intent to shoot anyone or with the intent to kill.

On cross-examination, the prosecutor asked defendant if he intended to pull the trigger.  Defendant responded, "I was in so much shock and awe.  The fact that they would assault somebody like that, it was – I seen him move for that knife.  And it was sure a reaction to the assault."  When asked the question again, defendant stated, "I didn't intend – I mean, that's a hard question.  I really --."  The prosecutor then stated, "Let me ask a different question then.  Did you know you were shooting your gun when you fired it?"  (Boldface omitted.)  Defendant responded:

> "That's still in the same area for me, mentally.  In that state, I was in shock from pulling the trigger, in shock that I shot the weapon.  So maybe I – no.  I was not a hundred percent aware of the fact that I was doing it.  It

was a reaction more than a thought. I didn't necessarily plan, in that second, to do it. It was just a reaction. I just reacted."

The prosecutor asked defendant again, "So when you had the gun, and you pull the trigger, and you are squeezing the trigger, did you mean to squeeze the trigger or not?" (Boldface omitted.) Defendant responded, "I don't even remember squeezing the trigger."

C. Rylant, a retired police officer, testified as an expert on behalf of the defense. Rylant's expertise "is in use of force" and the psychology and physiological aspects of use-of-force decisionmaking. Rylant testified his expertise is based on his former career as well as hundreds of hours of on-the-job and academic training. Rylant has a doctorate degree in clinical psychology and did his doctoral research "in use of force, the psychological and physiological aspects of decision-making during use of force." Rylant testified he had never met or spoken to defendant, but he had received documents from the case including police reports and videos from the incident. He was asked "to look at the entire incident and to discuss the dangerousness of a knife or potential knife, the distances between them and what type of psychological factors could be relevant to this case." Rylant explained, when a knife is potentially involved in an incident, "the seriousness of it and the threat level increases dramatically." He testified, "generally speaking, when somebody is involved in some sort of physical altercation, there's a fear response, which triggers a fight-or-flight response, which impairs decision-making." He explained fear causes a chemical reaction "[a]nd sometimes we're not really fully aware of it in the moment." When under stress, the brain switches from logical thinking to "more automatic processing." He explained, it is hard to impossible to make calculated decisions in moments of stress so police officers and military try to preplan appropriate decisions in advance. Rylant further testified a knife is an extremely dangerous weapon.

The defense also introduced multiple witnesses attesting to defendant's character. Chad T. testified he had known defendant for about 20 years. Chad and his wife were

12.

youth pastors and defendant went through their ministry. Chad described defendant as laid back, shy and quiet. Defendant would work for Chad on a rototiller. Chad never saw defendant get in a fight or threaten someone. Defendant went to the military at some point. Chad testified defendant is not the type of person that would just go out and shoot someone.

Justin G. testified he had known defendant since junior high and he considered defendant his good friend. Justin stated defendant was not the type of person who looks to get in fights or start things and Justin had never seen defendant get into a fight or get into someone's face. Justin also testified defendant was not the type of person that would go and just shoot someone for no reason.

Matt N. testified he had known defendant for about 20 years. They worked together "in bicycles"; defendant worked with Matt at Matt's bicycle shop for six years. They were friends and defendant had been a mentor to Matt. Matt testified he had not seen defendant get in a fight and did not know defendant to be a violent person or easy to anger. He did not think of defendant as the type of guy that would shoot someone and believed that to be outside his character.

**Jury Instructions, Verdict and Sentencing**

The trial court instructed the jury on first degree murder, second degree murder under actual and implied malice theories, and voluntary manslaughter under heat of passion and imperfect self-defense theories.

With regard to voluntary manslaughter, the jury was instructed:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of some quarrel or in the heat of passion if, one, the defendant was provoked; two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and, three, the provocation would have caused a person of average disposition to

13.

act rashly and without due deliberation that is from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.  In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.

"While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.  It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.

"You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"The People have the burden of proving, beyond a reasonable doubt, that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."

With regard to imperfect self-defense, the jury was instructed:

"The defendant acted in imperfect self-defense or imperfect defense of another if, one, the defendant actually believed that he or another person was in immediate danger of being killed or suffering great bodily injury; and, two, the defendant actually believed that the immediate use of deadly force was necessary to defend against that danger; but, three, at least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be.  In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"A danger is imminent if when the fatal wound occurred, the danger actually existed or the defendant believed it existed.  The danger must seem

14.

immediate and present so that it must be instantly dealt with. It may not be merely perspective or in the near future.

"If you find that the defendant knew that Jasper [G.] threatened others in the past, you may consider that information in evaluating the defendant's beliefs.

"The People have the burden of proving, beyond a reasonable doubt, that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder."

The jury was also instructed on self-defense or defense of another. During deliberations, the jury sent three notes. One asked for "refreshment on Brittany [B.] testimony." The second note stated:

"We are stuck between Second Degree Murder and Voluntary Manslaughter: Heat of Passion.

"We are not convinced of intent to commit the act (implied malice 1) and feeling like there was not justifiable provocation.

"How do we resolve this? Any guidance?"

A third note from the jury asked for defendant's testimony.

On the record, the court stated it was finding competing cases when it tried to draft an appropriate instruction in response to the jurors' second note, discussing *People v. Glenn* (1991) 229 Cal.App.3d 1461 (*Glenn*), in which the court initially did not find a need to instruct on involuntary manslaughter but, based upon a jury question that it was not convinced of intent to commit the act, it should have instructed on involuntary manslaughter. The court stated it started drafting the "[CALCRIM No.] 580 instruction" but it got "stuck," noting "[t]he instruction, in order to fill in the blanks, asks for either a crime specified as a misdemeanor, an infraction, or a non-inherently dangerous felony or a lawful act committed in an unlawful manner." The prosecutor asserted:

"Your Honor, second-degree murder, under implied-malice theory does not require an intent to kill. That second-degree murder can be abrogated, under heat of passion, to voluntary manslaughter. That, in and

15.

of itself, I believe, sufficiently establishes that involuntary manslaughter should not be, under these circumstances, an instruction given.

"This is a situation where the jury has indicated, based on their question, that they believe, at a minimum, the manslaughter exists as instructed. I believe an involuntary-manslaughter instruction would not be appropriate, at this time, for a number of reasons.

"And to address the Court's point about how to instruct on [CALCRIM No.] 580, this would be a much -- this is a detailed conversation to have about going through what possible crimes would be there, what lawful acts could be specified and identified. But under the facts, I don't believe that an involuntary-manslaughter instruction should be given.

"I believe the jury should be directed back to the instructions. I would also believe that it would be appropriate to advise the jury that if they all can agree on manslaughter, to fill out the appropriate form for that charge. Since they cannot agree on the charge of second-degree murder, return to the Court and inform the Court. And then we can proceed from there. That would be my suggestion."

Referencing the jury's note, the court stated the jury was not convinced of intent to commit the act, which is the first element for implied malice. The court continued:

"That means they are not stuck on second-degree murder because they are not convinced of an element. So as far as that piece goes, the Court would reinstruct on reasonable doubt, reinstruct on the fact that it applies to every element of the offense. And they must agree. I agree with you there – reinstruct on that.

"But they haven't told us that they are hung on second-degree murder. They are trying to sort out what they do with the facts before them because the facts before them, as they have found them, do not fit any of the instructions they have been provided.

"As far as [CALCRIM No.] 580, again, mostly agree with you, [prosecutor]. The way around that conundrum of sorting through the various crimes, lawful acts in an unlawful manner, misdemeanors, and infractions could be resolved by using the generic language in [CALCRIM No.] 580, which is a crime or lawful act in an unlawful manner, and work through those definitions."

16.

While defense counsel was formulating a response, the court noted the issue was complicated and it could give counsel time to look at it, read it, and process it as it did not "think this is a question that is going to be resolved in five minutes or in ten minutes." It noted, "This is not something I am going to take lightly and just decide on." The prosecutor suggested they respond to the jury's question with a question: "When you state you are not convinced of the intent to commit the act, are you representing that you have unanimously agreed that was not present, or is there deliberation and a split on that issue?" The prosecutor asked for a break for counsel to discuss the issue outside the presence of the court. When the parties returned from the break, the jury stated it had reached a verdict.

The jury found defendant not guilty of first degree murder but convicted him of second degree murder and found true the section 12022.53, subdivision (d) firearm enhancement. Defendant filed a motion for new trial asserting the court erred in denying defendant's request to inform the jury that codefendant, Bettencourt, was acquitted after a motion for a directed verdict. He also asserted the verdict "is contrary to the law" and there was substantial evidence he acted in imperfect self-defense and/or imperfect defense of others. In a sentencing brief, defendant asked the court to strike the section 12022.53, subdivision (d) enhancement in the furtherance of justice. Alternatively, he requested the court impose a lesser enhancement pursuant to section 12022.53, subdivision (b). He also asked the court to impose a determinate term for his second degree murder conviction. In a second sentencing memorandum, defendant cited the California Supreme Court's decision in *People v. Tirado* (2024) 12 Cal.5th 688 and urged the court to exercise its discretion to strike or stay the 25 years to life enhancement under section 12022.53, subdivision (d) or, alternatively, impose a lesser charged enhancement.

The court denied defendant's motion to reduce his second degree murder conviction and sentenced him to an indeterminate term of 15 years to life. The court struck sentencing on the section 12022.53, subdivision (d) firearm enhancement.

# DISCUSSION

In his sole issue on appeal, defendant contends the court erred in failing to instruct the jury, sua sponte, on involuntary manslaughter and the error requires reversal of the judgment. We disagree.

## Standard of Review

" 'A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citations.] This sua sponte obligation extends to lesser included offenses if the evidence "raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." ' " (*People v. Moon* (2005) 37 Cal.4th 1, 25.) Said differently, "A trial court has a sua sponte duty to instruct the jury on any uncharged lesser offense that is necessarily included in a charged offense if there is substantial evidence from which the jury could reasonably conclude that the defendant committed the lesser included offense but not the charged offense." (*People v. Lopez* (2020) 9 Cal.5th 254, 269; see *People v. Breverman* (1998) 19 Cal.4th 142, 162; *People v. Birks* (1998) 19 Cal.4th 108, 117–118.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman*, at p. 162.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid*.)

"An appellate court applies the independent or de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

18.

**Applicable Law**

Involuntary manslaughter involves the unlawful killing of a human being without malice in "the commission of an unlawful act, not amounting to a felony" or "the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

"The misdemeanor of brandishing a weapon is committed when a person draws or exhibits a firearm, in the presence of another person, 'in a rude, angry, or threatening manner.' (§ 417, subd. (a)(2).)" (*People v. Thomas*, *supra*, 53 Cal.4th at p. 814.) "Accordingly, an accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter." (*Ibid*.)

**Analysis**

Defendant contends there was sufficient evidence presented at trial to require the trial court to instruct the jury on involuntary manslaughter as a lesser included offense of implied malice second degree murder. He notes his counsel did not request such an instruction but, nevertheless, the trial court had a sua sponte obligation to instruct on lesser included offenses supported by sufficient evidence. Defendant argues his testimony and the testimony of Rylant provided evidence from which reasonable people could conclude defendant "acted reflexively without intent to kill, triggered by the perception – whether accurate or not – that Jasper [G.] made some motion that suggested he was about to brandish a knife." He asserts he "brandished a firearm toward Jasper [G.], potentially a misdemeanor under Penal Code section 417, subd. (a)(1) or potentially a defense of Karen [B.] and Brandy Bett[e]ncourt that was done unlawfully." And the jury "could conclude from the circumstances that [defendant's] mental state did not rise to implied malice, but nevertheless constituted criminal negligence" and his conduct led to Jasper G.'s death. Thus, he contends, a jury could have found the elements of

19.

involuntary manslaughter. Defendant relies upon *Glenn*, *supra*, 229 Cal.App.3d 1461, in support of his contention. He asserts there was "a reasonable probability that a juror could find that [defendant] acted reflexively and harbor reasonable doubt as to whether [he] subjectively held a conscious disregard for life," such that the instructional error was prejudicial. Defendant relies upon the jury's note to the court in which it indicated it was "not convinced of intent to commit the act" and their request for a readback of defendant's testimony. Defendant further contends the failure to instruct the jury on involuntary manslaughter resulted in a violation of his constitutional rights. The People disagree that substantial evidence existed to support an involuntary manslaughter instruction. Rather, they respond, defendant's "bare, equivocal denial that he intended to pull the trigger is not 'substantial enough to merit consideration [of involuntary manslaughter] by the jury.' " They also contend any alleged error was harmless as the jury necessarily rejected defendant's imperfect self-defense claim in convicting him of murder rather than manslaughter and it expressly found defendant intentionally fired the gun. They further contend, even if such an instruction was warranted, the verdict and the other evidence establish there is no reasonable probability defendant would have obtained a more favorable result had the instruction been given.

We cannot conclude the court prejudicially erred in failing to instruct the jury on involuntary manslaughter. First, we disagree with defendant on the question of whether there was substantial evidence to support such an instruction. "In order to find defendant guilty of only involuntary manslaughter, the jury would have had to conclude *both* that the shooting was accidental and that defendant had acted without malice." (*People v. Thomas*, *supra*, 53 Cal.4th at p. 815.) Accordingly, the record must contain substantial evidence to reasonably support a finding defendant did not subjectively realize the danger his actions posed. Here, it was undisputed defendant armed himself before entering the bar, he pulled out the weapon in the enclosed bar, aimed the loaded gun at the victim's midsection in close range and then he fired multiple shots. Defendant testified he owned

20.

guns; he had served in the military; he regularly went shooting, including earlier that day; and he had affixed a laser to the revolver he used in the instant shooting. But even if defendant's testimony the shooting was a "reaction" coupled with Rylant's testimony that use of force can be "automatic" could support a conclusion defendant was not fully aware of the consequences of his conduct, there was no substantial evidence the shooting was accidental. That is, defendant did not testify he pulled the trigger by accident. Indeed, there was no evidence presented that the shooting was accidental. To the contrary, defendant expressly admitted he shot the firearm, what he believed to be one time, because he saw Jasper's hand go to the knife and defendant "couldn't let it happen." On this record, the trial court had no sua sponte duty to instruct the jury on involuntary manslaughter. (See *People v. Sevilla* (2025) 115 Cal.App.5th 618, 629 [concluding court did not err in failing to instruct jury on involuntary manslaughter, finding "[t]here was no evidence of . . . negligent accident here[.] [The defendant] testified that he intentionally fired a loaded weapon twice into an occupied vehicle."]; *People v. Odell* (2023) 92 Cal.App.5th 307, 321–322 [holding trial court properly rejected involuntary manslaughter instruction because the defendant "deliberately procured a gun, loaded it, and sought to confront a large man at close quarters, pointing the gun at the man as he rushed towards him. 'Such conduct is highly dangerous and exhibits a conscious disregard for life.' [Citation.] No evidence suggested [the defendant] was unaware of this risk, which proved fatal . . . ."]; *People v. Brothers* (2015) 236 Cal.App.4th 24, 35 ["[W]hen, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter."]; *People v. Ibarra* (1982) 134 Cal.App.3d 413, 420, 421 [substantial evidence did not support giving of sua sponte involuntary manslaughter instruction despite the defendant's

21.

denial of intent to kill because conclusion was "inescapable" he harbored such intent in light of his testimony he intended to shoot the victim; he held his gun at the victim's chest within three to four feet of it; he knew the gun was loaded; his use of a bracing technique for steady aim; and his pulling the trigger a second time while in the deadly stance].) And we cannot conclude the failure to give such an instruction resulted in a violation of defendant's constitutional right to due process. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145 ["Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction."].)

*Glenn*, *supra*, 229 Cal.App.3d 1461, on which defendant relies, is inapposite. In *Glenn*, a jury convicted defendant of voluntary manslaughter after receiving instructions on first and second degree murder and voluntary manslaughter. (*Id*. at p. 1464.) The evidence at trial established the defendant killed the victim with a foot-long butcher knife. (*Id*. at p. 1463.) The defendant testified he and the victim were having breakfast when they got in an argument. (*Id*. at pp. 1463–1464.) The defendant stated he was armed with a butcher knife to protect himself from a neighborhood gang. (*Id*. at p. 1464.) He had the knife in his hand because it was too big to keep in his pants while he sat at the counter, and he was trying to put the knife back in his pants as he walked toward the door. (*Ibid*.) The defendant testified that, while he was walking to the door to leave, the victim approached him from behind and the defendant thought the victim was going to grab or attack him. (*Ibid*.) The defendant "instinctively turned around and [the victim] 'got stuck' with the knife."[5] (*Glenn*, at p. 1464.) The defendant also testified he intended to stab the victim but did not intend to kill him. (*Ibid*.) *Glenn* held the trial court erred in declining the defense's request to instruct the jury on involuntary manslaughter,

---

[5] The defendant's testimony was "contradictory as to how the stabbing occurred." (*Glenn*, *supra*, 229 Cal.App.3d at p. 1465.) He also testified he was afraid the victim "was going to attack him and he intended to stab [the victim] but not to kill him." (*Id*. at p. 1466.)

concluding part of the defendant's "testimony suggests the stabbing was accidental," referencing the defendant's testimony that he turned "in a reflex action" "and the knife entered the victim's chest causing a fatal wound."[6]  (*Glenn*, at pp. 1465–1466.)  In *Glenn*, the jury sent the court a note asking, " 'If we find the defendant not guilty of one/second degree murder or [voluntary] manslaughter, is involuntary automatically ruled in?"  (*Id.* at p. 1468.)  The *Glenn* court found the jury's note indicated the jury "was obviously confused by the court's striking the words involuntary manslaughter from some of the instructions but not others" and it also suggested the jury "wanted to consider involuntary manslaughter because it did not believe the evidence supported an intent to kill."  (*Ibid.*)  In concluding the instructional error required reversal, the *Glenn* court noted it was "not a case in which the omitted factual issue—intent to kill—was resolved against the defendant under some other properly given instruction."  (*Ibid.*)

Unlike in *Glenn*, as previously noted, here there was no substantial evidence defendant accidentally fired the gun at Jasper.  To the contrary, defendant, an avid and experienced shooter, expressly admitted he shot the gun, asserting he did so because he believed Jasper was reaching for his knife and defendant could not let that happen.  The surveillance footage and other evidence reflected that, before the shooting, defendant pulled out the loaded gun; the gun's laser was affixed on Jasper's body; and then defendant shot the gun three times.  Thus, the circumstances here are distinct from those in *Glenn* in which the jury could have concluded the defendant accidentally stabbed the victim when turning around.  And we cannot conclude Rylant's testimony that an individual may use force automatically or out of fear, established an involuntary

---

[6] Notably, *Glenn* was subsequently abrogated in part by *People v. Blakeley* (2000) 23 Cal.4th 82 (*Blakeley*), to the extent *Glenn* concluded "an unintentional killing in unreasonable self-defense can only be involuntary manslaughter." (*Blakeley*, at p. 91.) *Blakeley* clarified, "when a defendant, acting with a conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary rather than involuntary manslaughter." (*Ibid.*)

manslaughter instruction was required. (See *People v. Sevilla*, *supra*, 115 Cal.App.5th at p. 628 [rejecting argument an involuntary manslaughter instruction was required where there was evidence the defendant " 'responded out of fear because he thought he had been shot; his response was autonomic and lacked the specific intent to kill,' " noting the defendant identified no case in which such an instruction was required where there was evidence the defendant deliberately fired at an assailant out of fear].)

Nevertheless, even if we were to assume the evidence was sufficient to require a sua sponte instruction on involuntary manslaughter, we conclude any error in failing to give the instruction was harmless. " ' "[I]n some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." [Citations.]' " (*People v. Elliot* (2005) 37 Cal.4th 453, 475.) And, unlike in *Glenn*, the jury here expressly concluded defendant acted with malice in convicting him of second degree murder. (See *People v. Polley* (1983) 147 Cal.App.3d 1088, 1091 [concluding "[a]ny error in the failure to give the involuntary manslaughter instruction . . . was harmless" because "the verdict shows the jury rejected the first prerequisite to an involuntary manslaughter verdict: the absence of malice"]; see also *People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1145 ["the fact that the jury rejected manslaughter and found defendant guilty of the first degree murder of [the victim] precludes any possible error in the refusal to instruct on involuntary manslaughter"].) Additionally, as the People note, the jury expressly found true the section 12022.53, subdivision (d) firearm allegation, which required it to conclude defendant "personally and *intentionally* discharge[d] a firearm" (italics added) resulting in "great bodily injury

. . . or death" further establishing the jury concluded defendant intentionally, rather than accidentally, shot the victim. Additionally, we cannot conclude on the record before us there was a reasonable probability the jury would have concluded defendant was guilty of involuntary manslaughter. Rather, as discussed, there was no substantial evidence to suggest the shooting was accidental. Accordingly, based on the evidence presented, the jury was not reasonably likely to have convicted defendant of the lesser offense if instructions on involuntary manslaughter had been given.

## **DISPOSITION**

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

LEVY, Acting P. J.

FRANSON, J.